TELEMARK DEVELOPMENT GROUP, INC., a Nevada corporation, Plaintiff–Appellee, Cross–Appellant,

v.

John P. MENGELT, Defendant–Appellant, Cross–Appellee.

Nos. 02–1280, 02–1331.

United States Court of Appeals, Seventh Circuit.

Argued Sept. 5, 2002.

Decided Dec. 12, 2002.

Robert K. Blain (argued), Elmhurst, IL, for Plaintiff–Appellee, Cross–Appellant.

Martin W. Salzman (argued), Eric S. Rein, Schwartz, Cooper, Greenberger & Krauss, Chicago, IL, for Defendant–Appellant, Cross–Appellee.

Before COFFEY, RIPPLE and MANION, Circuit Judges.

RIPPLE, Circuit Judge.

Telemark Development Group, Inc. ("Telemark") brought this action against John Mengelt for breach of contract on a $55,000 promissory note. It alleged that Mr. Mengelt had refused to accept tender of payment on the note and had failed to return stock given as collateral. Mr. Mengelt brought a counterclaim, seeking the principal balance and accrued interest owed on the note. Both sides moved for summary judgment. The district court granted Telemark's motion as to liability but left the calculation of damages unresolved. The parties subsequently filed cross-motions for summary judgment on the issue of damages, and the district court granted Telemark's motion.

Mr. Mengelt appeals from the district court's grant of summary judgment in favor of Telemark on both liability and damages. Telemark appeals only from the district court's calculation of damages. We now affirm the judgment of the district court in all respects except as to prejudgment interest. On that matter, we remand the case to the district court for further consideration in conformity with this opinion.

# I

## BACKGROUND

### A. Facts

On August 27, 1997, Telemark executed and delivered to Mr. Mengelt a promissory note in the principal amount of $55,000 plus interest at 12% per annum retroactive to April 15, 1997.[1] The total amount was to be paid by April 15, 1998. As security for the note, Telemark endorsed to Mr. Mengelt 160,000 shares of Wasatch International, Inc. ("Wasatch"), a publicly traded corporation.[2] The stated value of the

---

1. This note was the product of a prior joint venture between Telemark and Mr. Mengelt. In December 1994, Telemark and Mr. Mengelt had entered into a joint venture to develop real estate in Arizona. Telemark had failed to repay Mr. Mengelt according to the terms of the original joint venture agreement. In complete settlement of this debt, Telemark executed the note that is at issue in this case.

2. It appears that, since the note was executed, Wasatch has become known as E–Pawn.com,

stock on the date of the note's execution was $.35 per share.

On April 6, 1998, Telemark partner Lawrence Muno wrote Mr. Mengelt a letter, informing him that Telemark did not have sufficient funds to pay the note on its April 15 due date. Muno further advised Mr. Mengelt that Telemark considered the note to be a "term note with no renewal provision" and that if Mr. Mengelt "wish[ed] to assert [his] remedies under the terms of the note," he should do so. R.22, Ex.G. Telemark, in fact, did not pay Mr. Mengelt when the note became due. Under the terms of the note, Mr. Mengelt, upon default, had the right to liquidate or possess the pledged stock for his own account; however, he did not exercise this right.

On December 23, 1998, Muno sent Mr. Mengelt another letter, again stating that Telemark lacked the funds necessary to retire the debt. In the same letter, Muno also indicated that, if Mr. Mengelt wanted to obtain a judgment against Telemark, the corporation would "be pleased to save [him] the litigation costs and execute a Confession of Judgment." R.22, Ex.I. Despite these communications, Mr. Mengelt did not take legal action to enforce the terms of the note, apparently because of a long-standing relationship with Muno.

More than a year elapsed without any further communication between the parties. During this time, the value of Wasatch stock increased dramatically.[3] In a letter dated March 7, 2000, Telemark's counsel offered to settle Telemark's indebtedness to Mr. Mengelt.[4] Specifically, the letter proposed a settlement in which Telemark would pay Mr. Mengelt the principal sum of $55,000 plus interest at the rate of 12% per annum through April 15, 2000. The computed total under this plan payable to Mr. Mengelt was $77,270. In return, Mr. Mengelt was required to return the 160,000 shares of Wasatch stock that he held as collateral for the note. The letter did not provide a specific date upon which the proposed transaction would take place but it did request a "prompt response" from Mr. Mengelt. R.22, Ex.J.

Within a few days of receiving the March 7, 2000, letter, Mr. Mengelt responded by telling Telemark's counsel "that any kind of settlement that [Telemark] might propose should be much more substantial in line with what [he] might have made in the stock market and that [he] didn't feel like this particular amount

Inc. However, because the note refers to Wastach stock, and the district court as well as the parties consistently have spoken of Wasatch stock, we shall employ the same terminology.

3. On March 7, 2000, Wasatch stock traded for as much as $8.38 per share. On March 8, 2000, Wasatch stock reached its highest value ever, trading for as much as $10.00 per share. R.33, Ex.1 at 1.

4. The March 7, 2000, letter stated in relevant part:

It is my clients' desire to reconcile the as yet unpaid amount due to you under the terms of the promissory note. The settlement we would propose will pay you the principal sum of $55,000.00 (Fifty Five Thousand Dollars) plus interest at the rate of 12% per annum through April 15, 2000. The computed total under this plan payable to you is $77,270.00 (Seventy Seven Thousand Two Hundred and Seventy Dollars). The formula we propose is the return of the 160,000 shares of Wasatch International stock advanced to you as collateral at the time of execution in exchange for certified funds in the amount of $77,270.00. This can be accomplished through my office or if you prefer, in consort with your counsel. Your prompt response to this proposal would be greatly appreciated.

R.22, Ex.J.

was appropriate." R.24, Ex.1 at 40. Mr. Mengelt also indicated that $200,000 would sufficiently compensate him for his losses. Telemark's counsel replied that he would speak to his clients. Following the March 7, 2000, letter, Telemark did not present Mr. Mengelt with a check or cash in satisfaction of the note, nor did Mr. Mengelt release the Wasatch stock.

On March 26, 2000, Telemark's counsel made another attempt to settle the dispute. Telemark's counsel faxed Mr. Mengelt a proposed settlement agreement that again called for Telemark to pay Mr. Mengelt $77,270 in exchange for his return of the Wasatch stock held as collateral and further provided that the parties would "agree to forever hold each other harmless from any and all future claims regarding the subject note." R.22, Ex.K. The fax instructed Mr. Mengelt to execute and return the settlement agreement by way of fax if he consented to its terms, and that "[u]pon receipt of the signed agreement by fax, [Telemark would] cause certified funds to be issued to [him] at which time [Telemark] would appreciate return of the subject stock certificates." *Id.* Mr. Mengelt did not sign the settlement agreement, nor did he return the pledged stock as Telemark requested. Telemark, in turn, did not pay the note. Meanwhile, the value of Wasatch stock declined rapidly; by the end of 2000 the stock was trading at pennies per share.

## B. District Court Proceedings

Telemark filed this action against Mr. Mengelt on June 15, 2000. It alleged that he had breached the terms of the note by refusing to accept Telemark's tendered payment and by failing to return the pledged stock. In addition to the return of the Wasatch stock, Telemark sought damages in an amount equal to the difference between the value of the stock on March 8,

2000, and the value of the stock on the date of return. On July 21, 2000, Mr. Mengelt filed a counterclaim to collect the principal balance and accrued interest owed on the note.

On April 4, 2001, Telemark and Mr. Mengelt filed cross-motions for summary judgment. The parties' submissions focused on whether Telemark's March 7, 2000, settlement offer constituted a legally sufficient "tender of payment" under Illinois law. On May 4, 2001, the district court granted summary judgment in favor of Telemark on the issue of liability, finding Mr. Mengelt liable for conversion of the pledged stock. The district court found that "no genuine issue of fact [stood] in the way of its determination that Telemark's March 7, 2000 offer constituted a valid tender so that Mengelt's rejection of that offer was a breach of his obligations under the Note." R.30 at 15. The district court reserved judgment on the issue of damages pending the parties' submission of additional evidence. On September 21, 2001, Telemark and Mr. Mengelt filed cross-motions for summary judgment on damages. On January 17, 2002, the district court granted summary judgment in favor of Telemark and ordered Mr. Mengelt to pay Telemark damages in the amount of $520,000, offset by $77,270, the amount still owed to Mr. Mengelt under the terms of the note.

## II

## DISCUSSION

■ The district court granted summary judgment in favor of Telemark on both liability and damages. We review a district court's decision to grant a motion for summary judgment de novo, construing all facts, and drawing all reasonable inferences from those facts, in favor of the nonmoving party. *See Nevel v. Vill. of*

*Schaumburg,* 297 F.3d 673, 678 (7th Cir. 2002). Summary judgment is proper when "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c).

## A. Liability

■ Under Illinois law, "[t]he primary duty of a pledgee is to return the article pledged to the pledgor immediately upon the performance of the obligation for which the security was given, or on tender of such performance, and his refusal so to do amounts to a wrongful conversion." *Cottrell v. Gerson,* 371 Ill. 174, 20 N.E.2d 74, 78 (1939).[5] It follows that if Telemark made a legally sufficient tender of the amount owed under the note, it was entitled to a return of the Wasatch stock, and Mr. Mengelt's failure to do so amounts to conversion.

Accordingly, the controlling issue on appeal is the legal effect of Telemark's March 7, 2000, letter and Mr. Mengelt's ensuing response to that letter.[6] Telemark maintains that it made a legally sufficient tender on March 7, 2000, when it offered to pay Mr. Mengelt $77,270 in satisfaction of the note and that Mr. Mengelt refused the tendered payment, insisting on a payment of $200,000 for return of the stock. In the alternative, Telemark submits that it was excused from tendering payment because Mr. Mengelt made it clear in advance of payment that he would not accept the amount actually due in discharge of the debt. In either case, Telemark asserts that Mr. Mengelt wrongfully retained the pledged stock in contravention of the terms of the note.

Mr. Mengelt, on the other hand, asserts that the March 7, 2000, letter did not constitute a legally sufficient tender under Illinois law because it was not accompanied by actual payment. According to Mr. Mengelt, the letter constituted no more than an offer to tender payment at some undetermined point in the future. Mr. Mengelt further argues that Telemark was not excused from its obligation to tender payment because his response to the March 7, 2000, settlement offer did not rise to the level of an outright rejection, such that any further attempt by Telemark to tender the amount actually due under the note would have been vain or futile. Consequently, Mr. Mengelt asserts that his duty to return the pledged stock never arose because Telemark failed to satisfy its obligation under the note.

■ There appears to be no relevant statutory definition of a "tender."[7] Con-

---

5. *See also Eldred v. Colvin,* 206 Ill.App. 2 (1917) (holding that a broker's refusal to return pledged securities after customer paid amount due him constituted conversion of securities); *Schwartz v. Chi. State Pawners Soc'y,* 195 Ill.App. 93 (1915) (holding that pledgor's tender of amount due immediately extinguished pledgee's lien and his retention of property thereafter amounted to conversion).

6. The parties have not raised the legal effect of the March 26, 2000, settlement offer.

7. Under Article 9 of the Illinois Uniform Commercial Code ("UCC"), in effect during the relevant period, a debtor may redeem collateral following default at any time before the secured party has disposed of the collateral "by tendering fulfillment of all obligations secured by the collateral as well as the expenses reasonably incurred by the secured party in retaking, holding and preparing the collateral for disposition." 810 Ill. Comp. Stat. 5/9–506. According to the Official Comment to § 9–506, tender "means more than a new promise to perform the existing promise; it requires payment in full of all monetary obligations then due and performance in full of all other obligations then matured." However, beyond this explanation, the term "ten-

sequently, we must look beyond the Uniform Commercial Code to the common law of Illinois to determine the legal effect of Telemark's March 7, 2000, letter. *See* 810 Ill. Comp. Stat. 5/1–103 ("Unless displaced by the particular provisions of this Act, the principles of law and equity . . . shall supplement its provisions.").[8] In the absence of a controlling statutory definition, Illinois courts routinely have held that " '[t]ender' is an unconditional offer of payment consisting of the actual production of a sum not less than the amount due on a particular obligation." *Brown & Kerr, Inc. v. American Stores Prop., Inc.*, 306 Ill. App.3d 1023, 240 Ill.Dec. 117, 715 N.E.2d 804, 812 (1999).[9]

### 1.

Telemark has admitted that it did not actually produce the money to satisfy its obligation under the note. It is undisputed that at no time did Telemark send Mr. Mengelt cash, a check or otherwise transfer funds. Because Illinois law re-

quires that a valid tender of payment include both an unconditional offer and an actual production of the money to be paid, Telemark's March 7, 2000, letter was not a tender of payment. Instead, Mr. Mengelt is correct that the letter was an offer to tender payment in the future. Thus, Telemark must rely on its alternate argument that its obligation to tender payment was excused as a result of Mr. Mengelt's conduct following his receipt of the March 7, 2000, offer.

Under Illinois law, tender may be excused when the conduct of the creditor makes it "reasonably clear that such [tender] would be a vain, idle, or useless act." *Casciola v. Gardner*, 101 Ill.App.3d 852, 57 Ill.Dec. 241, 428 N.E.2d 921, 923 (1981) (quoting *Needy v. Sparks*, 74 Ill. App.3d 914, 30 Ill.Dec. 905, 393 N.E.2d 1252, 1255 (1979)); *see also Quality Molding Co. v. American Nat'l Fire Ins. Co.*, 287 F.2d 313, 315 (7th Cir.1961) ("It has been held in Illinois, that a tender is unnecessary where it is known that the ten-

---

der" is not defined in Article 9 or elsewhere in the Code.

Mr. Mengelt submits that for purposes of § 9–506 of the UCC, tender requires actual payment of the full amount due and anything short of actual payment is ineffective as a tender. Telemark, on the other hand, simply denies that § 9–506 is relevant to this case. According to Telemark, "[t]hat provision has to do with the redemption of collateral following the retaking of the collateral by a secured creditor" and in the present case, "Telemark was not attempting to 'redeem' anything. It was only seeking the return of property which [Mr.] Mengelt was contractually obligated to return to Telemark." Telemark's Br. at 10.

We note further that under Article 3· of the Illinois UCC, the law of tender generally applicable to simple contracts is also applicable to negotiable instruments. *See* 810 Ill. Comp. Stat. 5/3–603(a) ("If tender of payment of an obligation to pay an instrument is made to a person entitled to enforce the instrument, the effect of tender is governed by principles of law applicable to tender of payment under a

simple contract."). We need not resolve definitively the differences among the parties on the applicability of these provisions because none answer directly and comprehensively the issue of whether a tender took place in this case. To the extent that the Code Commentary is helpful, it points to the same result as our discussion of the Illinois case law.

8. *Accord Owens v. Auto. Recovery Bureau, Inc.*, 544 S.W.2d 26, 31 (Mo.Ct.App.1976) (stating that common law principles relative to tender in general are controlling and decisive as to the scope and meaning of tender as used in § 9–506).

9. *See also Arriola v. Time Ins. Co.*, 323 Ill. App.3d 138, 256 Ill.Dec. 168, 751 N.E.2d 221, 227 (2001); *MXL Indus., Inc. v. Mulder*, 252 Ill.App.3d 18, 191 Ill.Dec. 124, 623 N.E.2d 369, 377 (1993); *cf. Ortman v. Kane*, 389 Ill. 613, 60 N.E.2d 93, 97 (1945) ("There is no rule of law giving to a notice of an intended tender the force and effect of an actual tender.").

der would be unacceptable."). The rationale behind this rule is that equity "will not allow the ends of justice to be perverted or defeated by the omission of an unimportant or useless act, which nothing but a mere technicality could require." *Smith v. Eiger*, 143 Ill.App. 552, 556 (1908) (quoting *Dwen v. Blake*, 44 Ill. 135, 141 (Ill.1867)). Accordingly, "[w]here a creditor, in advance of an offer to pay, or in response to such offer, informs the party under obligation to pay that he will not accept the amount actually due in discharge of the indebtedness, the party under obligation to pay is relieved of the duty of tendering the amount actually due." *Needy v. Sparks*, 74 Ill.App.3d 914, 30 Ill.Dec. 905, 393 N.E.2d 1252, 1255 (1979) (quoting *Gorham v. Farson*, 119 Ill. 425, 10 N.E. 1, 7 (1887)); *see also Burnham Mgmt. Co. v. Davis*, 302 Ill.App.3d 263, 235 Ill.Dec. 401, 704 N.E.2d 974, 981 (1998).

We therefore must determine whether Mr. Mengelt's statement excused Telemark from its obligation to tender actual payment. In resolving this issue, we note that Telemark and Mr. Mengelt do not contest the material facts. It is undisputed that Telemark failed to pay the note when it became due on April 15, 1998, and that, under the terms of the note, Mr. Mengelt had the right to liquidate or possess the pledged stock for his own account upon default, but he failed to exercise this right. Additionally, in a letter dated March 7, 2000, Telemark's counsel proposed to pay Mr. Mengelt the principal sum of $55,000 plus interest at the rate of 12% per annum through April 15, 2000, in exchange for Mr. Mengelt's return of the pledged stock. This sum was the full amount due on April 15, 2000. Finally, Mr. Mengelt responded to Telemark's offer by stating "that any kind of settlement offer that [it] might propose should be much more substantial in line with what [he] might have made in the stock market" during the time the note was in default and that he believed he was entitled to receive $200,000 in return for the pledged stock. R.24, Ex.1 at 40.

Although the parties do not dispute the foregoing facts, they vigorously dispute the proper conclusion to be drawn from those facts. Telemark asserts that Mr. Mengelt's response to the March 7, 2000, letter "was exactly the type of outright rejection of a debtor's offer to pay the obligation in full which the case law says excuses actual tender of payment." Telemark's Br. at 10. Mr. Mengelt, on the other hand, contends that Telemark's obligation to make tender was not excused because his response to the settlement offer did not rise to the level of an outright rejection such that tender would have been futile. According to Mr. Mengelt, a reasonable jury could determine that his response constituted no more than hard-bargaining, and that, when push came to shove, he would have accepted actual tender in the amount of $77,270 in satisfaction of the note.

We must conclude that Mr. Mengelt's response was not sufficiently ambiguous to create a genuine issue of material fact for trial and that as a matter of law Telemark was excused from its obligation to tender payment. Although Mr. Mengelt attempts to minimize the significance of his conduct, he admits that, in response to the March 7, 2000, letter, he informed Telemark's counsel "that any kind of settlement offer that [Telemark] might propose should be much more substantial" and that he requested Telemark pay him $200,000 in satisfaction of the debt. R.24, Ex.1 at 40. We think that these statements, along with Mr. Mengelt's failure to return the pledged stock, made it reasonably clear that a tender would not have been accepted and therefore would have been a useless act.

## 2.

■ It is important to note that Mr. Mengelt was not entitled to receive anything more than he was offered in the March 7, 2000, letter. Under Illinois law, "a tender must include everything to which the creditor is entitled, and a tender of any less sum is nugatory and ineffective as a tender." *Smith v. Gen. Co. Corp.*, 11 Ill. App.3d 106, 296 N.E.2d 25, 28 (1973); *see also River Valley Cartage Co. v. Hawkeye–Sec. Ins. Co.*, 17 Ill.2d 242, 161 N.E.2d 101, 104 (1959) ("A valid tender by the debtor must be 'sufficient to cover all that the creditor then has a right to recover, whether of debt, interest or costs. If he tender less, then the tender is not good.'"(quoting *Sweetland v. Tuthill*, 54 Ill. 215, 216 (1870))). Consequently, it is incumbent upon the debtor "to make sure that his tender is sufficient in amount." *Smith*, 296 N.E.2d at 28.

■ Accordingly, if Telemark had offered to pay Mr. Mengelt an amount less than he was entitled to receive under the note or Illinois law, then Mr. Mengelt's ensuing response would not have excused Telemark from its obligation to tender the amount legitimately owed; Mr. Mengelt would have been under no duty to return the pledged stock. As a general rule, a debtor is not entitled to the return of the pledged property until the entire debt has been paid or until there has been a proper tender of the payment. *See Ellis v. Conrad Seipp Brewing Co.*, 107 Ill.App. 139, 140 (1903), *aff'd* 207 Ill. 291, 69 N.E. 808 (1904) ("When collateral is held for the payment of a debt, the owner of such collateral . . . is not entitled to a release of the collateral until the entire debt is paid.").

The note provided that "the entire amount, principal and interest, shall be due and payable no later than April 15, 1998." R.3, Ex.A. Significantly, the note did not provide for a default rate of interest in the event that the entire amount was not paid by April 15, 1998; however, the note did provide that upon default Mr. Mengelt "shall have the right to liquidate or possess for his account the collateral pledged to secure this note." *Id.* As indicated previously, Mr. Mengelt did not exercise his right to liquidate or possess the stock for his own account. Because the note did not specify that liquidation of the collateral was Mr. Mengelt's exclusive remedy upon default, we must look beyond the terms of the note to determine what Mr. Mengelt could have required from Telemark in light of its two-year default.

■ Under Illinois law, "[c]reditors shall be allowed to receive at the rate of five (5) per centum per annum for all moneys after they become due on any bond, bill, promissory note, or other instrument of writing." 815 Ill. Comp. Stat. 205/2. However, "a negotiable instrument which bears a specific rate of interest but contains no provision as to any different rate after maturity continues to bear the specified rate after maturity until paid." *In re Lorraine Castle Apartments Bldg. Corp., Inc.*, 158 F.2d 44, 45–46 (7th Cir. 1946) (applying Illinois law); *see also German Ins. Co. of Freeport v. Getzendaner*, 137 Ill. 234, 34 N.E. 297, 303 (1891); *Bressler v. Harris*, 19 Ill.App. 430, 437 (1885); *Etnyre v. McDaniel*, 28 Ill. 201, 203 (1862). Because Telemark offered to settle the note by paying Mr. Mengelt the principal sum of $55,000 plus interest at the rate of 12% per annum through April 15, 2000, Mr. Mengelt was not entitled to receive anything more than he was offered.

## 3.

Finally, Mr. Mengelt submits that, even if his response rose to the level of an outright rejection, Telemark's obligation to tender payment was not excused because

Telemark failed to prove that it had the funds necessary to satisfy its indebtedness under the note. In support of this argument, Mr. Mengelt relies on *Schmahl v. A.V.C. Enterprises, Inc.*, 148 Ill.App.3d 324, 102 Ill.Dec. 15, 499 N.E.2d 572 (1986). Telemark, on the other hand, asserts that *Schmahl* is inapplicable to this case and that the evidence clearly establishes that Telemark was prepared to make the payment. We agree with Telemark.

In *Schmahl*, the debtor offered to settle his obligation under an overdue note by asking the creditor to accept "cash and/or property" in full satisfaction of the debt. *Schmahl*, 102 Ill.Dec. 15, 499 N.E.2d at 573. At the time of his proposal, the debtor acknowledged that he did not have sufficient funds available to pay the debt completely in cash. The debtor confirmed this fact in his deposition, stating that he had half the necessary funds available in cash but the remainder would have come from "illiquid assets, real estate or sums due us by certain subsequent dates." *Id.* The creditor "refused to accept any payment in cash and/or property, and no money changed hands in satisfaction of the outstanding debt or any part thereof." *Id.* at 574. When the creditor sued the debtor to collect on the note, the debtor argued that his obligation to tender payment was excused by the creditor's rejection of his settlement offer. The court rejected this argument, stating that "[w]hile [the creditor's] conduct in refusing to accept payment might arguably raise factual questions sufficient to preclude summary judgment if the tender was adequate, it cannot be permitted to excuse an inadequate tender of the amount owing from a party manifestly lacking the ability to satisfy the debt." *Id.* at 575–76.

Unlike the creditor in *Schmahl*, Telemark offered Mr. Mengelt a complete cash payment in settlement of the note. Furthermore, Telemark partners Muno and Del Mastro both testified that, at the time of the proposed settlement, Telemark could have obtained the necessary funds from Telemark's parent company, Pacific Group Holdings ("Pacific"). As the parent company's sole shareholders, Muno and Del Mastro were both signatories on Pacific's account and the evidence clearly established that Pacific had sufficient funds to pay the note. Based on these facts, it is reasonably clear that Telemark had the ability to satisfy the debt. Certainly, Telemark was not "manifestly lacking the ability to satisfy the debt" as was the debtor in *Schmahl. Id.* at 576. Under these circumstances, there is no reason to engage in the speculative task of inquiring whether Telemark actually possessed the funds necessary to make good on its settlement offer.[10]

## B. Damages

### 1.

Both Mr. Mengelt and Telemark appeal from the district court's ruling on damages. The district court awarded Telemark $520,000 in damages based on the market value of Wasatch stock on April 17, 2000. The district court selected this date because, in its estimation, the date best reflected "what would have transpired if [Mr.] Mengelt had instead honored his obligation by accepting Telemark's offer." R.43 at 7.

To determine what would have transpired had Mr. Mengelt accepted Telemark's offer to tender payment, the district court made a number of findings.

10. Mr. Mengelt offered no evidence to rebut Telemark's claim that Pacific had adequate funds.

Initially, the district court recognized that, under the facts of this case, Mr. Mengelt was not obligated to return the stock on the date that Telemark made its offer. Instead, Mr. Mengelt's "obligation would have arisen when the payment was actually made available—something that would necessarily have involved at least some lapse of time for [Mr.] Mengelt to accept the offer and then for Telemark to arrange for certified funds." R.30 at 14–15. From there, the district court determined that the exchange of money for the pledged stock would have been completed by March 31, 2000, because it found no reason to conclude that the exchange would have taken longer. Then the district court found that Telemark could not have sold the pledged stock immediately upon receipt because the stock was unregistered and restricted as to resale. The district court found that, in order to sell the pledged stock, Telemark would have had to obtain verification that the SEC Rule 144(k) exemption, which provides that stock owned for more than two years after acquisition becomes exempt from resale restrictions, applied to the stock in question.

To determine the length of time this process would have required, the district court evaluated the two Rule 144(k) verification transactions that Telemark previously had engaged in with other restricted Wasatch stock. The first transaction, requested on March 7, 2000, took fifteen days for completion. The second transaction, requested on March 24, 2000, took over nine months for completion. Although the two transactions resulted in very different waiting periods, the district court determined that the transaction for the pledged stock would have resulted in a waiting period similar to the first transaction because Mr. Mengelt did not submit any evidence indicating that the pledged stock would have been subject to delay.

Accordingly, the district court applied a fifteen-day period in determining the date on which the pledged stock would have been available to Telemark for resale and valued the stock as of April 17, 2000. On this date, Wasatch stock was valued at $3.25 per share.

Telemark submits that the district court erred when it used April 17, 2000, as the valuation date because it failed to compensate adequately Telemark for its loss. Telemark contends that Mr. Mengelt breached the agreement on March 7, 2000, and that, because courts are hesitant to permit parties to benefit from their own wrongdoing, the district court should have measured damages as of March 8, 2000, when the stock was trading at $10 per share. Essentially, Telemark's position is that the proper measure of damages for conversion of stock is its highest value reasonably close to the date of conversion. Telemark further maintains that the district court's ruling relied on two faulty assumptions. First, Telemark asserts that the district court determined incorrectly that the exchange of stock for money would not have occurred until March 31, 2000, because there is no reason to believe that the exchange could not have taken place immediately. Second, Telemark asserts that the district court assumed incorrectly that Telemark could not have sold the stock until the restrictive legends were removed.

Mr. Mengelt, on the other hand, submits that the district court's ruling on damages must be reversed because it is based on speculation and conjecture. First, Mr. Mengelt asserts that the district court erred by picking March 31, 2000, "out of the air" as the date upon which the exchange of cash for stock would have been completed. He notes that neither the March 7, 2000, offer nor the March 27, 2000, offer mentioned a date for complet-

ing the proposed exchange. Second, Mr. Mengelt asserts that the district court decided arbitrarily that the restrictive legends would have been removed from the stock within fifteen days; in his view, the process could just as easily have taken nine months, as evidenced by Telemark's two prior transactions. Finally, and most significantly, Mr. Mengelt submits that there is no proof that Telemark would have sold the stock once it was able to do so. In fact, Mr. Mengelt argues that the evidence shows that Telemark would not have sold the stock because it held 56,000 shares of unrestricted Wasatch stock during the relevant time period, which it never attempted to sell. Because it is unclear that Telemark would have sold the stock, Mr. Mengelt argues that Telemark was not injured by his failure to return the stock and, therefore, is not entitled to recover damages.

■■■■■ As the party seeking to recover, Telemark has the burden of proving damages to a reasonable degree of certainty. *See Jensen v. Chi. & W. Ind. R.R. Co.,* 94 Ill.App.3d 915, 50 Ill.Dec. 470, 419 N.E.2d 578, 593 (1981); *Williams v. Bd. of Educ. of Clinton Cmty. Unit Sch. Dist. No. 15 of DeWitt County,* 52 Ill.App.3d

328, 10 Ill.Dec. 161, 367 N.E.2d 549, 553 (1977). Damages may not be awarded on the basis of conjecture or speculation. *See Schoeneweis v. Herrin,* 110 Ill.App.3d 800, 66 Ill.Dec. 513, 443 N.E.2d 36, 42 (1982). Under Illinois law, the ordinary measure of damages for conversion of personal property is the fair market value of the property at the time of conversion. *See Jensen,* 50 Ill.Dec. 470, 419 N.E.2d at 593.[11] The same rule generally adheres when the property converted is stock. *See Burns v. Shoemaker,* 172 Ill.App. 290, 296 (1912).

However, where the stock appreciates in value after the date of conversion, several courts have held that the plaintiff may recover the highest value of the stock within a reasonable time after the conversion.[12] Illinois courts have indicated their agreement with such an approach on a few occasions, at least in the context of breach of contract.[13]

■■■ Telemark is entitled to recover damages based on the market value of the stock at the time of conversion or within a reasonable time thereafter. Accordingly, we must first determine the date upon

---

**11.** *See also Harney–Morgan Chevrolet Olds Co. v. Rabin,* 118 Ill.App.3d 602, 74 Ill.Dec. 100, 455 N.E.2d 130, 134 (1983); *Williams v. Bd. of Educ. of Clinton Cmty. Unit Sch. Dist. No. 15 of DeWitt County,* 52 Ill.App.3d 328, 10 Ill.Dec. 161, 367 N.E.2d 549, 553 (1977); *Long v. Arthur Rubloff & Co.,* 27 Ill.App.3d 1013, 327 N.E.2d 346, 355 (1975); *First Nat'l Bank of Mount Prospect v. York,* 27 Ill.App.3d 614, 327 N.E.2d 400, 402 (1975).

**12.** *See, e.g., Schultz v. Commodity Futures Trading Comm'n,* 716 F.2d 136, 141 (2d Cir. 1983) (holding that the proper measure of damages for conversion of stock is either its value at the time of conversion or its highest intermediate value between notice of conversion and a reasonable time thereafter, whichever is higher).

**13.** *See Mercantile Holdings, Inc. v. Keeshin,* 261 Ill.App.3d 546, 199 Ill.Dec. 9, 633 N.E.2d 805, 807 (1993) (holding that the proper measure of damages for breach of an assignment agreement resulting in debtor's loss of stock was the highest intermediate value reached by the stock between the breach and the date of judgment); *American Nat'l Bank & Trust Co. v. Erickson,* 115 Ill.App.3d 1026, 72 Ill.Dec. 71, 452 N.E.2d 3, 6 (1983) (holding that the trial court's award to plaintiffs of a sum representing the value of loaned shares as of the date of judgment was proper because a lesser award would have enabled defendants to benefit from breaching the agreement and also would have deprived plaintiffs of the increased value of the shares, which they would have received had the agreement been performed).

which the conversion took place.[14]

Although Telemark would have us conclude that the conversion took place on March 7, 2000, the record simply cannot support such a conclusion. First, Telemark has provided no evidence of when the offer was communicated to Mr. Mengelt. While Telemark made the offer in a letter dated March 7, 2000, the record does not reflect when Mr. Mengelt received this letter. Second, we agree with the district court that Mr. Mengelt was not obligated to return the stock on the same day that Telemark communicated its offer. Instead, Mr. Mengelt would have been required to return the stock at the time that Telemark actually produced the amount due under the note. As the district court recognized, this date would have been sometime in the future because Mr. Mengelt would have had to accept the offer and Telemark would then have had to arrange for the transfer of certified funds. Indeed, based on the language of the March 7, 2000, letter, it is clear that Telemark itself anticipated that the exchange would take place at some point in the future. Because the letter did not specify the exact date upon which the proposed exchange would take place, the district court had to determine when Mr. Mengelt reasonably could have been expected to accept the offer and when Telemark would have arranged for certified funds to be transferred to Mr. Mengelt.

Mr. Mengelt's suggestion that the district court chose March 31, 2000, "out of thin air" is less than charitable. Indeed, such an assertion does not comport with the record. It is clear that the court spent a great deal of effort in attempting to make an accurate determination. We agree with the district court that, when the record is viewed in the light most favorable to Mr. Mengelt, the transaction (money in exchange for stock) would have been completed on or before March 31.[15]

Although Telemark's March 7, 2000, letter did not specify a closing date for the proposed transaction, it did request a "prompt response" from Mr. Mengelt.[16] Additionally, on March 26, 2000, Telemark's counsel faxed Mr. Mengelt a proposed settlement agreement that again called for Telemark to pay Mr. Mengelt $77,270 in exchange for his prompt return of the pledged stock. The fax instructed Mr. Mengelt to execute and return the settlement agreement by way of fax and that "[u]pon receipt of the signed agreement, [Telemark would] cause certified funds to be issued to [him] at which time [Telemark] would appreciate return of the subject stock certificates." R.22, Ex.K. According to the March 26 correspondence, Telemark contemplated that the exchange would occur immediately after Mr. Mengelt accepted its offer. Finally, Telemark offered substantial evidence showing that the necessary funds were available to it through Pacific, its parent company. As Pacific's sole shareholders, Telemark part-

14. If Telemark had made a formal tender of payment and if Mr. Mengelt had rejected that tender on the same day, the date of the conversion would be readily ascertainable. Here, the situation is more complex. We already have determined that Telemark did not actually tender the amount due; instead, its obligation to tender payment was excused by Mr. Mengelt's response to its offer to satisfy completely its obligation on the note.

15. Accordingly, this is the date upon which the conversion took place.

16. We recognize that Telemark's March 7, 2000, offer proposed payment of interest to Mr. Mengelt through April 15, 2000; however, the parties do not suggest that this date was mentioned for any reason other than to ensure that Mr. Mengelt was offered everything that he was due.

ners Muno and Del Mastro were both signatories on Pacific's account, and were prepared to take the funds from its account to make good on Telemark's settlement offer.

Now that we have determined that the conversion took place on March 31, 2000, we must ascertain the value of the converted stock as of that date. Telemark provided evidence that, during the relevant time frame, the active market in Wasatch stock readily could have absorbed a block of 160,000 shares. Telemark also provided evidence that Wasatch stock was trading at $5.19 per share on March 31, 2000. However, this price did not take into account the effect of the restrictive legend appearing on the pledged stock certificates.

Although Telemark submits that the restrictive legend would not have detracted from the price of the stock, and that it could have sold the stock immediately upon its return from Mr. Mengelt, the evidence is to the contrary. The record establishes that Telemark would have had to obtain verification that the SEC Rule 144(k) exemption applied to the stock in question before it could have been sold in the marketplace. Mr. Mengelt submitted the affidavit of Richard Parker, a securities transfer agent, who described the well-established practice for handling stock with restrictive legends that have expired. Parker attested:

> In order to resell Rule 144–k restricted stock in the market place, the restrictive legend must be removed. When a holder of Rule 144 restrictive stock wants to reissue that stock with the restrictive legend removed after that stock has been fully purchased for at least two years, the holder must complete a Form 144–k .... Once the Form 144–k and the restricted stock are submitted to the transfer agent, these submittals are given to the stock issuer for clearance in order to make sure that the holder is not an insider. The stock issuer then either approves, removing the restrictive legend, or objects to such removal. If the removal is objected to by the stock issuer, the transfer agent informs the holder, who then obtains a legal opinion to submit to the stock issuer in order to overcome the objection.

R.42 at ¶ 6. None of the evidence submitted by Telemark directly rebuts Parker's affidavit. Additionally, Telemark's own actions fail to support its argument. Telemark followed the identical process described in Parker's affidavit with respect to other restricted Wasatch stock that it owned.

■■■■ Because Telemark could not have sold the stock immediately upon its return, it was necessary to discount the value of the stock in order to determine its true market value as of the date of conversion. The district court achieved this result when it determined that the pledged stock would not have been available to Telemark for resale for fifteen days and valued the stock as of April 17, 2000, when Wasatch stock was trading at $3.25 per share.

Mr. Mengelt contends that the district court erred in applying a fifteen-day period because, in his view, the process could just as easily have taken nine months, as evidenced by one of Telemark's prior transactions. We must reject Mr. Mengelt's argument because it is not supported by the record. Parker stated in his affidavit that, based upon his experience, "it generally takes one week between the time a Rule 144–k form is submitted and the issuer approves the removal of the restrictive legend, provided there is no objection raised by the issuer." R.42 at ¶ 7. However, Parker also stated that, "[w]hen objections are raised, there is no definitive time frame for overcoming those objections."

*Id.* Mr. Mengelt is correct that Telemark had engaged in two prior transactions in which Wasatch raised an objection and that the transactions resulted in very different waiting periods. However, we believe that the district court properly applied the shorter waiting period because Mr. Mengelt failed to introduce any evidence indicating that the pledged stock would have been subject to an extended delay.

Finally, we also reject Mr. Mengelt's contention that we are required to determine whether Telemark, once in receipt of the stock, would then have decided to sell it. In our view, that inquiry is both too speculative and unnecessary to the task at hand. The proper measure of damages for conversion of stock is the fair market value of the property at the time of conversion or within a reasonable time thereafter, taking into account any particular factors, including the presence of a restrictive legend, that might have detracted from that purchase price. Because the district court followed this formula in calculating damages, we affirm its judgment.

**2.**

■■■■■ The final issue remaining for our consideration is Telemark's assertion that it is entitled to receive prejudgment interest on its compensatory award from the date of valuation until the date of judgment. "In Illinois the right to prejudgment interest in a conversion action arises only where authorized by statute." *Charles Selon & Assoc., Inc. v. Estate of Aisenberg,* 103 Ill.App.3d 797, 59 Ill.Dec. 457, 431 N.E.2d 1214, 1217 (1981); *see also Jensen v. Chi. & W. Ind. R.R. Co.,* 94 Ill.App.3d 915, 50 Ill.Dec. 470, 419 N.E.2d 578, 597 (1981). Section 2 of the Illinois Interest Act provides in relevant part that interest shall be allowed at the rate of 5% per annum on " 'money withheld by an unreasonable and vexatious delay of payment.' " *Charles Selon & Assoc.,* 59 Ill. Dec. 457, 431 N.E.2d at 1217 (quoting 815 Ill. Comp. Stat. 205/2). Illinois courts have extended this provision "to include property withheld where such property has been wrongfully taken or taken and converted into money or its equivalent." *Id.; see also Geohegan v. Union Elevated R.R. Co.,* 266 Ill. 482, 107 N.E. 786, 791 (1915); *Jensen,* 50 Ill.Dec. 470, 419 N.E.2d at 597. Accordingly, "prejudgment interest is warranted in a conversion action where there has been an unreasonable and vexatious delay of payment." *Charles Selon & Assoc.,* 59 Ill.Dec. 457, 431 N.E.2d at 1217; *see also Kelrick v. Koplin,* 73 Ill. App.2d 63, 219 N.E.2d 758, 762 (1966). However, "[a]n honest dispute as to the existence of a legal obligation will not result in an unreasonable and vexatious delay which would permit recovery of interest." *Emmenegger Constr. Co., Inc. v. King,* 103 Ill.App.3d 423, 59 Ill.Dec. 237, 431 N.E.2d 738, 743 (1982); *see also Kelrick,* 219 N.E.2d at 762 ("The reasonable defense of a suit does not constitute unreasonable and vexatious delay.").

■■■■■ Whether a delay was unreasonable and vexatious is a question of fact to be determined by the trial court in the first instance. *See Woll v. Loeb,* 185 Ill. App.3d 497, 133 Ill.Dec. 598, 541 N.E.2d 809, 812 (1989); *Selon,* 59 Ill.Dec. 457, 431 N.E.2d at 1217. As a reviewing court, we shall not disturb the trial court's determination unless it is contrary to the manifest weight of the evidence. *See Woll,* 133 Ill.Dec. 598, 541 N.E.2d at 812; *Selon,* 59 Ill.Dec. 457, 431 N.E.2d at 1217. In this case, however, the district court did not rule on Telemark's request for interest. Accordingly, we remand this issue to the district court.

## Conclusion

For the foregoing reasons, we affirm the district court's grant of summary judgment for Telemark on both liability and damages. We remand, for consideration in accordance with this opinion, the issue of prejudgment interest. Telemark may recover its costs in this court.

AFFIRMED in part, REMANDED in part