In the

# United States Court of Appeals
## For the Seventh Circuit

No. 04-4267

MATTHEW MARK URBANIA,

*Plaintiff-Appellant,*

*v.*

CENTRAL STATES, SOUTHEAST AND SOUTHWEST
AREAS PENSION FUND, and BOARD OF TRUSTEES
OF THE CENTRAL STATES SOUTHEAST AND
SOUTHWEST AREAS PENSION FUND,

*Defendants-Appellees.*

Appeal from the United States District Court
for the Northern District of Illinois, Eastern Division.
No. 00 C 6510—**George M. Marovich**, *Judge.*

ARGUED MAY 10, 2005—DECIDED AUGUST 31, 2005

Before FLAUM, *Chief Judge,* and KANNE and WILLIAMS,
*Circuit Judges.*

WILLIAMS, *Circuit Judge.*   Plaintiff Matthew Urbania
sued his employee pension benefit plan, defendant Cen-
tral States, Southeast and Southwest Areas Pension
Fund (hereinafter, "Central States" or "the Fund"), because
the plan denied his application for a disability pension. The
district court granted summary judgment in favor of the
defendant and Urbania appeals. Because the plan's admin-
istrators properly interpreted the plan's operative terms in
finding that the plaintiff failed to meet the requisite criteria

for establishing an entitlement to a disability pension, and thus did not act arbitrarily or capriciously in denying the benefit, we affirm.

## I.  BACKGROUND

### A.  Defendant Central States and the Disability Pension

Central States is an employee pension benefit plan, as defined in § 3(2)(A) of the Employee Retirement Income Security Act ("ERISA"). *See* 29 U.S.C. § 1002(2)(A). Central States is a tax-qualified, not-for-profit trust fund that is administered by employer and employee trustees. The Fund provides retirement and disability pensions to qualified employees who work in the Teamster Industry under collective bargaining agreements that require employers to make contributions on behalf of covered employees to Central States. The Central States Trust Agreement grants the Fund's trustees the discretion to establish these benefit plans, as well as discretionary authority to administer such plans and decide benefit claims.

Payment of plan benefits is governed by the Fund's Pension Plan Document—particularly, for purposes of this appeal, the 1980 Plan Document (hereinafter, "the Plan"). To become eligible for disability pension benefits, a Fund participant under the age of 62 years must (1) be totally and permanently disabled, *see* Plan Section 4.06(a) & (c); (2) have ten years of Credited Service under the Plan, *see* Plan Section 4.06(a)(2); (3) be eligible for Social Security disability benefits, *see* Plan Section 4.06(a); and (4) become disabled before sustaining three consecutive one-year breaks in service, *see* Plan Section

4.06(a)(2) & (d).[1] Of the terms introduced by these four

---

[1] Plan Section 4.06 provides in pertinent part:

  (a) A Participant who *sustains a total and permanent disability* as hereinafter defined

     (1) Prior to his 62nd birthday; and

     (2) *after completion of 10 years of Credited Service* (as defined in Section 3.03) if at least 35 weeks of contributions to the Pension Fund have been made or were required to have been made on behalf of the Participant during each of 5 calendar years of Covered Employment, or at least 225 weeks of contributions have been made or were required to have been to the Pension Fund on his behalf, *subject to the Break in Service provisions of Section 3.05*; and

     (3) after contributions by his last Employer on his behalf under a Collective Bargaining Agreement providing for contributions in amounts at least equivalent to those required for Contribution Class 4 or above;

  shall be eligible for a Disability Pension Benefit under this Plan *if he is entitled to disability benefits payable under Title II of the Social Security Act* (as evidenced by a Certificate of Social Insurance Award) *or if said Participant has sustained a disability which would satisfy the medical and physical requirements for such Certificate of Social Insurance Award* where the Participant did not receive such Certificate for reasons unrelated to his medical and physical condition.

  (b) . . .

  (c) Disability, as used herein, shall be deemed to be total and permanent, for purposes of this section, whenever the Participant is wholly disabled by

                                          (continued...)

individual requirements, three merit immediate note.

First and foremost is the term "total and permanent disability." In order to qualify for a disability pension, the Plan requires that the participant "sustain a total and permanent disability as hereinafter defined." Plan Section 4.06(a). That "hereinafter" definition is supplied by Section 4.06(c), which provides that

> [d]isability, as used herein, shall be deemed to be total and permanent, for purposes of this section, whenever the Participant is wholly disabled by bodily injury or disease, and will as a result be permanently, continuously and wholly prevented for life from engaging in any occupation and performing any work for wage or profit.

With respect to the second requirement—that a participant have ten years of "Credited Service" under the Plan—Section 3.03 of the Plan defines "Credited Service." Under this provision, a participant will earn one year of Credited Service for each year in which a participant had at least 1000 hours of Covered Employment[2] prior to January

---

[1]  (...continued)
> bodily injury or disease, and will as a result be permanently, continuously and wholly prevented for life from engaging in any occupation and performing any work for wage or profit. . . . .

> (d)  A Participant shall be eligible for a Disability Pension Benefit *if he sustains a total and permanent disability while still in Covered Employment or before sustaining 3 consecutive One-Year Breaks in Service* (as defined in Section 3.05(c)).

(emphasis added).

[2]  Plan Section 3.02(a) defines "Covered Employment" as "[a]ny employment of an Employee for which contributions to the
(continued...)

1, 1976. For employment after 1976, a participant will earn one year of Credited Service for each year in which at least 35 weeks of contributions to the Fund were made on the participant's behalf.

The requirement that the participant become disabled before sustaining three consecutive one-year breaks in service turns in large part, of course, on what constitutes a "One-Year Break in Service." Toward that end, Plan Section 3.05(c) provides: "On or after January 1, 1976 a Participant shall sustain a One-Year Break in Service at the end of any calendar year in which he receives less than 10 Vesting Service Weeks." A "Vesting Service Week," per Plan Section 3.04(b)(1), is a week in which a contribution "is made or is required to be made to the Pension Fund on [a participant's] behalf." Suffice it to say, if a participant stops working covered employment for three straight years, he will be ineligible for the disability pension if he is injured thereafter.

## B. Urbania's Employment History and On-the-Job Injuries

Plaintiff Matthew Urbania took on various jobs in the Ohio Teamster Industry for intermittent periods of time between 1965 and 1981. During those periods, he was a Fund participant, and his employers made contributions on his behalf to Central States accordingly. In 1981, however, Urbania was laid off from covered Teamster employment (Halls Motor Transit) and moved to Florida. Since 1981, Central States has not received any contributions on the

---

[2] (...continued)
Pension Fund are made or required to be made on his behalf . . . in accordance with the rules and regulations of this Plan and Trust Agreement."

plaintiff's behalf. As it stands today, based on his total time in covered employment, Urbania has accrued 9.839 years of credited service[3] and 11 years of vesting service.[4]

After leaving covered employment in early 1981, Urbania took on various jobs between 1981 and 1986 for non-union employers, none of which participated in Central States. He suffered two on-the-job injuries while working those non-covered jobs. The first injury occurred on June 21, 1982, while he was working with Page Avjet Corporation. He tripped and fell in the cockpit of an airplane, hurting his back. The second injury occurred on October 16, 1986, when, in the course of his employment with D.J.'s Drywall Inc., he tripped and hurt his back while lifting drywall. On both occasions, the plaintiff filed and settled worker's compensation claims—the Page Avjet settlement netting him $12,250 in December 1983, and the D.J.'s Drywall settlement bringing in $82,004.30 in June 1989. He was also awarded three periods of disability by the Social Security Administration—the first from June 1982 to

---

[3] There is some discrepancy in the record as to whether the number of credited service years that the plaintiff has accrued totals 9.825 or 9.839. As this opinion will make clear, the discrepancy is inconsequential, as both numbers fall short of the requisite ten-year minimum for a disability pension—a number that all parties concede Urbania has failed to reach. For purposes of consistency, and in keeping with our obligation in reviewing summary judgment to resolve all genuine issues of material fact in the non-moving party's favor, *see Telemark Dev. Group, Inc. v . Mengelt*, 313 F.3d 972, 976 (7th Cir. 2002), we will use the higher figure.

[4] The plaintiff's 11 years of vesting service qualified him under the Plan for a Vested Pension in the amount of $103.83 per year for life starting at age 58. He remains qualified for, and will, when he reaches 58 years, receive, this pension. The Vested Pension is not here a subject of dispute.

December 1983, the second in November 1986, and the third beginning June 1988.

## C. Urbania's Application for a Central States Disability Pension

On February 4, 1998, Urbania filed an Application for a Disability Pension with Central States, claiming under oath that he became totally disabled as a result of a job related injury on June 21, 1982. He further claimed that he had not been able to work since that date. The application listed no employment after June 1982, and suggested that "Worker's Compensation Disability" had sustained him in the interim. In addition, several documents from the Social Security Administration were submitted in support of Urbania's application. One such document was an Award Certificate dated July 12, 1988, denoting November 1986 as his date of entitlement to Social Security disability benefits. Another was a Notice of Favorable Decision and a Decision dated October 11, 1990, finding Urbania disabled under the Social Security Act and entitled to a period of disability commencing on June 1, 1988.

However, the October 11, 1990 Decision, as well as several documents attached thereto, indicated that Urbania was able to, and in fact did, return to work after his June 1982 injury—notwithstanding his disability pension application's claim to the contrary. The decision noted that after his 1982 back injury, Urbania "eventually returned to work." Indeed, along with medical records detailing medical advice rendered to Urbania encouraging him to return to work within specified physical limits, documents revealed that Urbania had taken on jobs as a janitor (for four to five months in 1984), a long-distance trucker (sometime before August 12, 1986), and a drywall hanger (sometime before October 16, 1986). In addition, Social Security records indicated that the plaintiff received income after his 1982

injury from various sources, including Lodge No. 1851 of the Loyal Order of the Moose in Sanford, Florida (1984); Alexander-Seewald Co. in Marietta, Georgia (1985); Eagle Pools in Granite Falls, Washington (1985); and, of course, D.J.'s Drywall in Winter Park Florida (1986). The record also includes Urbania's Worker's Compensation Notice of Injury, which he filed after the October 1986 accident to claim on the injury he suffered while working as a drywall hanger with D.J.'s Drywall.

Central States ultimately denied Urbania' application for a disability pension, finding that he failed to establish that he was totally and permanently disabled before sustaining three consecutive one-year breaks in service. Though Urbania claims to have been disabled as of June 1982, the defendant, noting in particular the evidence of Urbania's odd jobs between 1982 and 1988, found the disability was not total and permanent until June 1988. And because, in the eyes of Central States, Urbania's disability was not total and permanent until 1988, he had clearly sustained three consecutive one-year breaks in service—namely, 1982, 1983, and 1984, the three years immediately succeeding his last year of covered employment (1981). Though the issue of Urbania's insufficient years of credited service (having only 9.839 when he needed 10) was also at issue from the outset of his application—indeed, Urbania and his union even went so far as to inquire whether Central States might allow him to cure this disqualifying deficiency—the defendant did not list this as a reason for denying plaintiff's application in its final decision on review.

After exhausting administrative appeals of the defendant's decision, Urbania filed this action before the district court. The district court granted summary judgment in the defendant's favor, finding that the defendant trustee's decision to deny the disability application was not arbitrary

and capricious. In particular, the court found that Urbania failed (1) to meet the requirement of 10 years credited service (having accrued only 9.839 years) and (2) to establish that he was totally and permanently disabled before sustaining three consecutive one year breaks in service because, in spite of his claimed June 1982 disability onset date, he had worked other jobs thereafter. Urbania appeals.

## II.  ANALYSIS

### A.  Standard of Review

We review the district court's grant of summary judgment on ERISA claims de novo. *Hightshue v. AIG Life Ins. Co.*, 135 F.3d 1144, 1147 (7th Cir. 1998). Where, as here, the employer's ERISA plan grants its administrator with discretion to pay or deny claims, we review the administrator's benefit claim decisions under the arbitrary and capricious standard. *Id.*; *see also Firestone Tire & Rubber Co. v. Bruch*, 489 U.S. 101, 110-11 (1989). Accordingly, we will reverse Central States' denial of Urbania's disability pension application only if that decision was arbitrary and capricious.

### B.  Consideration of Less Than 10 Years of Credited Service

Of the four qualifying requirements for a disability pension, one is that a participant must have 10 years of credited service. The district court found it "undisputed" that plaintiff had not obtained 10 years of credited service—accruing only 9.839 years. Urbania, however, raises two arguments with respect to this finding. First, he argues that because he had earned 11 "Vesting Service Years" under the plan, it must follow that he also earned over 10 years of credited services. This argument is patently frivolous, as the terms of the plan make

clear that years of vesting service and credited service are calculated differently. The plan clearly defines Credited Service Years and Vested Service Years, and it defines them quite differently. While it takes only 20 "Vesting Service Weeks" in a calendar year to earn a "Vesting Service Year," *see* Plan Sections 3.04(a) & (b)(1), it takes (as of 1976) 35 weeks of plan contributions to earn a "Credited Service Year," *see* Plan Section 3.03. Each such year is accrued and calculated to provide distinct and separate entitlements under the plan. Eleven Vested Service Years does not equal eleven Credited Service Years. Nor is the eleven years of the former necessarily greater than ten years of the latter. The plan administrators were neither arbitrary nor capricious in refusing to compare apples to oranges.

Though the outcome is ultimately the same, Urbania's second argument with respect to the 10 Credited Service Years does have more appeal. Here he contends that the district court improperly considered the fact that Urbania had earned less than 10 years of Credited Service in evaluating whether the defendant's denial of benefits was arbitrary and capricious, because Central States did not cite insufficient credited service as a justification for denying the pension in its final claim denial letter. 29 U.S.C. § 1133(1) requires every employee benefit plan under ERISA to "provide adequate notice in writing to any participant or beneficiary whose claim for benefits under the plan has been denied, setting forth the specific reasons for such denial." Indeed, in *Reich v. Ladish Co.*, we noted a plan administrator is "required to give [a plan participant] every reason for its denial of benefits at the time of the denial" and that "[i]t may not add new reasons as the litigation proceeds." 306 F.3d 519, 524 n.1 (7th Cir. 2002) (citations omitted). To the extent that Central States failed in its final decision to mention the credited years deficiency, Urbania argues that the defendant cannot rely on such a reason now.

However, as we held in *Perlman v. Swiss Bank Corp. Comprehensive Disability Protection Plan*, 195 F.3d 975, 981-82 (7th Cir. 1999), "[d]eferential review of an administrative decision means review on the administrative record." Looking to the administrative record as a whole, it is abundantly clear here that the plaintiff was clearly on notice of his credited years deficiency and its effect in disqualifying him from a disability pension. Indeed, it would be disingenuous for Urbania to claim here that he was not so apprised. In a letter dated February 17, 1998, soon after his application for the pension was first filed, the defendant rejected Urbania's claim because, among other reasons, "you do not have 10 years of service credit. You have 9.839 years of contributory service credit." That this message was received by Urbania loud and clear is evidenced by the Level I appeal that Teamsters Local Union 377 filed on his behalf on July 27, 1998. The appeal states, "Mr. Urbania has 9.839 years of contributory credit through 1981. . . . We feel that he should be allowed to make the necessary payments to get the full 10 years of contributory credit to qualify for the Disability Award." Urbania was given further notice of this disqualifying ground in an October 5, 1998 letter from Central States, which, in advising him that his appeal to the Benefit Claims Review Committee had been denied, stated, "It is the decision of the committee that you are not eligible for a Disability Pension Benefit because you have not established at least 10 years of Credited Service." The Benefit Claims Review Committee again noted the 10-year credited service requirement of Plan Section 4.06(a)(2) in a letter to Urbania dated February 11, 1999. And finally, the minutes of Urbania's Level III appeal before the trustees, which repeatedly note that Urbania had established only 9.839 years of credited service, shows that the insufficient credited service years issue was clearly before that reviewing body.

As Urbania rightly points out, Central States' final claim denial letter issued on July 29, 1999 after the trustees

review makes no mention of insufficient service credit as a ground for denying the disability pension. Rather, the letter rests on the fact that the onset of Urbania's disability did not occur until three consecutive one-year breaks in service had passed. This omission, however, is readily explainable. Having been notified initially that he was just short of the required 10-year threshold, Urbania and his union made repeated requests that he be allowed to make additional contributions to the Fund so as to qualify himself. Central States, however, subsequently found an alternative and independently sufficient reason for denying benefits that would render further payments by Urbania wasteful—namely, the three consecutive one-year breaks in service. Rather than tantalize Urbania with a putatively curable disqualification, the defendant in its final decision letter provided the incurable disqualification alone. Thus, Central States, which has consistently maintained insufficient credited service as a justification for denial, did not abandon the ground by omission. It simply put the argument of "cure" to rest by advancing a separate, incurable ground. While it would have been cleaner had the defendant referenced this ground as well in its final decision, the administrative record makes clear that Urbania was on notice of the deficiency. The district court did not err in noticing the disqualification too.

## C. Section 4.06(a) Does Not Define "Total and Permanent Disability"

Urbania next argues that the plan administrators acted arbitrarily and capriciously by not interpreting the Plan such that a person eligible for Social Security benefits would be automatically entitled to benefits under the plan. If that was the proper interpretation, Urbania would have been considered disabled as of June 1982, when he was first entitled to Social Security benefits.

However, Urbania's interpretation is rendered unreasonable by the plain language of the Plan. As discussed above, there are four requirements to qualify for the disability pension, and eligibility for Social Security benefits is only one of them. *See* Plan Section 4.06(a)-(d); *supra*, n.1 and accompanying text. First and foremost among the pension's prerequisites is that a participant sustain a "total and permanent disability." Plan Section 4.06(a). And while Section 4.06(a) requires that a "totally and permanently disabled" participant be eligible for Social Security, it does not suggest that eligibility for Social Security renders a participant "totally and permanently disabled." Rather, Section 4.06(c) defines "total and permanent disability," and its definition is far more expansive than Social Security eligibility alone.[5] Thus, a participant must be both eligible for Social Security as provided by Section 4.06(a) and totally disabled as defined in Section 4.06(c) to qualify for a disability pension. In other words, eligibility for Social Security benefits is necessary, but not sufficient, to secure entitlement to a disability pension under the Central States Plan. Accordingly, Central States did not act arbitrarily and capriciously by failing to interpret the Plan in a manner that would find Urbania absolutely entitled to a disability pension as of the date that he became eligible for Social Security benefits. That's just not how the Plan reads.

---

[5]  We again note the pertinent provisions of Plan Section 4.06(c):

> Disability, as used herein, shall be deemed to be total and permanent, for purposes of this section, whenever the Participant is wholly disabled by bodily injury or disease, and will as a result be permanently, continuously and wholly prevented for life from engaging in any occupation and performing any work for wage or profit.

**D. Urbania Accrued Three Consecutive One-Year Breaks in Service**

Another condition to qualify for a disability pension requires that the disability be sustained while the participant is in covered employment or before sustaining three consecutive one-year breaks in service. Plan Section 4.06(a)(2) & (d); *see also* Plan Section 3.05. It was upon Urbania's failure to satisfy this condition that the defendant ultimately based its decision to deny him the pension. Urbania argues that this decision too was arbitrary and capricious. He contends that he did not sustain three such years because, though his last year of covered employment was in 1981, he claims to have sustained his disability in June 1982 when he first received Social Security benefits.

As we have repeatedly noted, total and permanent disability under the defendant's Plan requires much more than mere receipt of Social Security Benefits. It requires that the participant be "wholly disabled by bodily injury or disease," such that he or she is "permanently, continuously and wholly prevented for life from engaging in any occupation and performing any work for wage or profit." Plan Section 4.06(c). With this proper understanding of the Plan's terms, the defendant reviewed the facts of Urbania's case. There they found an applicant who, despite his claimed June 1982 disability onset date, had not only been given medical clearance and encouragement to find employment in the years thereafter, but also had in fact taken on several jobs between 1982 and 1988. Equipped with evidence of the applicant's post-1982 work history and (albeit limited) capacity, Central States reasonably concluded that Urbania was not so disabled as of June 1982 as to render him "permanently, continuously and wholly prevented for life from engaging in any occupation and performing any work for wage or profit." And while Central States concedes

that Urbania did ultimately become so disabled, it identified the onset date of that disability as 1988.

Urbania nonetheless attempts to halt the accrual of one-year breaks in service between 1982 and 1988 by citing Plan Section 3.05(g), which credits participants for working during any weeks they are not in covered employment "as a result of sickness, injury, vacation or disability." He argues that, pursuant to 3.05(g), the disability he suffered in June 1982 should toll the clock on his breaks in service, and thereby insulate his application from breaks-in-service disqualification notwithstanding a 1988 disability onset date. But this section does not apply to Urbania—it only applies to participants not in covered employment "*as a result of* sickness, injury, vacation or disability." To be out of covered employment as a result of sickness, injury, vacation or disability, a participant would have to have been in covered employment immediately preceding that sickness, injury, vacation or disability. As of June 1982, Urbania's absence from covered employment was a result of his being laid off by his last covered employer (Halls Motor Transit) in 1981, not as a result of his injury or disability. Urbania was injured in the course of employment—but it was *non-covered* employment, suffered while on the job with Page Avjet in Florida.

Because the injury occurred in the course of non-covered employment, Section 3.05(g) could not have been triggered to stop the break-in-service clock; and because that injury did not render Urbania totally disabled, his entitlement to a disability pension could not at that time vest. Thus, Urbania's one-year breaks in service began in 1981 when he was laid off from covered employment. Because defendant was not arbitrary and capricious in finding that the disability did not become permanent and total until June 1988, it is clear that more than three consecutive one-year breaks in service accrued since his 1981 departure from covered employment.

**E. Judicial Estoppel Does Not Apply**

Finally, Urbania argues that Central States is judicially estopped from divesting him of his disability pension based on his return to work after June 1982. Judicial estoppel provides that when a party prevails on one legal or factual ground in a lawsuit, that party cannot later repudiate that ground in subsequent litigation based on the underlying facts. *Moriarty v. Svec*, 233 F.3d 955, 962 (7th Cir. 2000). To apply, (1) the latter position must be clearly inconsistent with the earlier position; (2) the facts at issue must be the same in both cases; and (3) the party to be estopped must have prevailed upon the first court to adopt the position. *United States v. Hook*, 195 F.3d 299, 306 (7th Cir. 1999).

Urbania argues that, in a prior action, Central States retroactively paid Plan disability benefits to another participant (Charles Turner) despite the fact that that participant had previously gone back to work for one month. With this prior action in mind, Urbania insists that the defendant cannot today assert his re-employment as grounds for denying him the pension. However, if the facts at issue in these two cases are related, their relation is tangential at best. In Turner's case it was undisputed that the participant was entitled to a disability pension, the issue there was how much he was entitled to receive. Here, in contrast, the issue is whether Urbania even qualifies for a disability pension at all. Considering that Turner's eligibility in the prior matter went uncontested, Central States does not appear to have advanced any position whatsoever in that case with respect to when a disability becomes compensable under the Plan. But even were we to assume an identity of facts and the defendant's assumption of a contrary position, judicial estoppel cannot be invoked here because Central States never prevailed upon a court to adopt that position— Turner's case was dismissed for lack of jurisdiction and its merits never reached. *Turner v.*

*Central States Pension Fund,* No. C-3-86-384 (S.D. Ohio 1992). Thus, judicial estoppel does not here apply.

### III.  CONCLUSION

For the foregoing reasons, we affirm the district court's grant of summary judgment in the defendants' favor.

A true Copy:

     Teste:

_____
*Clerk of the United States Court of
Appeals for the Seventh Circuit*