**Shannon L. HASLUND, Plaintiff,**

v.

**SIMON PROPERTY GROUP, INC., Defendant.**

No. 01 C 9587.

United States District Court, N.D. Illinois, Eastern Division.

Sept. 26, 2003.

Timothy M. Nolan, Nolan Law Office, Chicago, IL, for Plaintiff.

Marc S. Silver, Donald J. McNeil, Barnes & Thornburg, Chicago, IL, for Defendants.

### FINDINGS OF FACT, CONCLUSIONS OF LAW AND JUDGMENT ORDER

SHADUR, Senior District Judge.

Shannon Haslund ("Haslund") has sued Simon Property Group, Inc. ("Simon Group") in an action originally brought in the Circuit Court of Cook County, but then timely removed to this District Court by Simon Group on diversity of citizenship grounds. After the completion of discovery and this Court's approval of the parties' jointly submitted Final Pretrial Order, this Court conducted a bench trial that included the live testimony of three witnesses, the deposition testimony of Simon Group's principal David Simon ("Simon") and the parties' joint and individually submitted exhibits.

What follows are this Court's Findings of Fact ("Findings") and Conclusions of Law ("Conclusions") as required by Fed. R.Civ.P. ("Rule") 52(a). To the extent (if any) that the Findings as stated may be deemed conclusions of law, they shall also be considered Conclusions. In the same way, to the extent (if any) that matters later expressed as Conclusions may be deemed findings of fact, they shall also be considered Findings. In both of those respects, see *Miller v. Fenton*, 474 U.S. 104, 113–14, 106 S.Ct. 445, 88 L.Ed.2d 405 (1985).

### Findings of Fact

#### Parties and Jurisdiction

1. At the time this action was removed from its original place of filing in the Circuit Court of Cook County to this District Court, Haslund was a Colorado citizen. Simon Group was and is a citizen of the States of Delaware and Indiana, because it is incorporated under the laws of the State of Delaware and its principal place of business is located at 115 West Washington Street, Indianapolis, Indiana. Such removal was proper pursuant to 28 U.S.C. § 1441(a)[1] because this Court would have had original jurisdiction of this action on the basis of diversity of citizenship under Section 1332, with the amount in controversy, exclusive of interest and costs, exceeding $75,000.

#### Negotiations Between the Parties

2. During the latter half of 1999 Melanie Alshabkhoun (who customarily used the name "Alshab" and is referred to in that way here) approached Haslund for the purpose of hiring her as an employee of Simon Group. Alshab then served as Senior Vice President and Chief Information Officer of Simon Group as well as President of clixnmortar.com ("clixnmortar"). At all times relevant to this action, David Simon ("Simon") served as CEO of Simon Group and also exercised the ultimate authority over clixnmortar. Although clixnmortar was incorporated on October 21, 1999 (before Alshab's discussions with Haslund ripened into the contract of employment referred to in later Findings), its capital structure was not then settled upon—hence the necessary reference to "1% equity," in the negotiations between Alshab (who was the agent expressly authorized to carry out that responsibility on behalf of Simon Group) and Haslund, in the course of defining Haslund's entitlement to an ownership interest in clixnmortar as part of the consideration for her agreement to become employed by Simon Group and for her having begun that employment.

3. During their negotiations Haslund informed Alshab that in order for her to

---

1. All further references to Title 28's provisions will simply take the form "Section—."

consider resigning her then-existing position at Ernst & Young, Haslund wanted (a) an increase in her base salary, (b) a comprehensive benefits package including vested vacation days and (c) a firm, unconditional percentage ownership interest (which Haslund and Alshab referred to as "founder's equity") in clixnmortar. During those negotiations both Haslund and Alshab used that term "founder's equity" not as a term of art, but rather as referring to an ownership interest provided to persons who are absolutely necessary to a start-up venture and who join such a venture early on.[2] In this instance it is important to remember that it was Simon Group itself that agreed to employ Haslund, directing her to render services to its subsidiary clixnmortar, and that Simon Group relatedly agreed to provide her with an ownership in clixnmortar that vested immediately upon her actual entry into employment.

4. Haslund initially demanded a 2 to 3% founder's equity in clixnmortar as a condition of any employment agreement to be reached. She also characterized her demand for founder's equity as a "deal breaker" and demanded that the terms of her employment with Simon Group, including the offer of such founder's equity in clixnmortar, be reduced to writing. Alshab informed Haslund that her terms were reasonable but that Alshab first needed to obtain Simon's authorization.

5. In December 1999 Alshab personally conferred with Simon and informed him (a) that Haslund had demanded a 2 to 3%

founder's equity in clixnmortar and (b) that such founder's equity was a "deal breaker" for Haslund. Thereafter Simon interviewed Haslund at Simon Group's headquarters in Indianapolis. After that interview Simon authorized Alshab to extend an offer of the employment by Simon Group to Haslund, including a 1% founder's equity in clixnmortar. Simon described Simon Group's offer of 1% founder's equity in clixnmortar as "generous."[3]

*Haslund's Employment Contract*

6. On December 20, 1999 Alshab authorized Simon Group to transmit a letter confirming its offer of employment to Haslund. That offering letter ("Letter Agreement," Jt. Ex. 2) accurately reflects the terms of Haslund's employment with Simon Group. In that respect, the language "1% equity in clixnmortar.com" was drafted by Alshab and refers specifically to Haslund's 1% equity interest in clixnmortar as expressly authorized by Simon in his capacity as Simon Group's CEO.

7. Although Simon Group argues otherwise (but without referring to any testimony or other record evidence), this Court credits the uncontroverted testimony of Alshab and Haslund that the latter became entitled to a 1% equity in clixnmortar as soon as she accepted the Simon Group offer and began working for Simon Group. Nothing in the Letter Agreement provided, or contemplated, that Haslund's 1% equity interest was subject to dilution, forfeiture or restrictions of any kind. It is

**2.** Although any further references to "founder's equity" in these Findings will not be enclosed in quotation marks, the term will be employed in the sense referred to here.

**3.** Although Simon disclaimed any express recollection of the discussions referred to in this Finding 5, this Court found Alshab to be an entirely credible witness (as was Haslund). Because Simon's testimony was provided by deposition rather than in person, this Court lacked the full opportunity that is ordinarily available to evaluate a witness' credibility by observing the witness' demeanor as well as considering the content of the witness' testimony. It therefore does not make a fully adverse determination as to Simon's believability, although the vagueness of his responses as to issues critical to this litigation clearly left much to be desired and raised serious doubts as to his overall credibility.

uncontroverted in the evidence, and this Court hereby finds, that Haslund's 1% equity interest was not tied to any public offering of stock, and that it was separate and distinct from any stock that Haslund might thereafter receive through some future stock option program.

8. Alshab also caused Simon Group to include the language "structure to be determined" following the Letter Agreement's reference to "1% equity" because of the fact that no specific clixnmortar stock structure was in place at the time that Simon Group made its offer to Haslund. In that regard both Alshab and Haslund agreed that the number and type of shares Haslund would ultimately receive was simply to be a function of the future determination of clixnmortar's financial structure. Regardless of the ultimate stock structure or the number and type of shares issued by clixnmortar, Haslund was entitled to own an unconditional and unrestricted 1% of clixnmortar's equity.

9. Simon Group's offer of employment embodied in the Letter Agreement also included 15 days of paid vacation, Simon Group's insurance and benefit plans, reimbursement of business-related expenses and relocation assistance. Although the normal policy of Simon Group was for vacation days to be earned pro rata as services were rendered, Haslund negotiated for—and Alshab accepted on behalf of Simon Group—an agreement that Haslund became entitled to all 15 paid vacation days for her initial year of employment immediately upon her arrival at Simon Group, to be drawn against as and when Haslund used vacation days during that year.

10. Haslund accepted Simon Group's offer of employment as embodied in the Letter Agreement. On December 27, 1999 she began working for Simon Group, at its direction, as Vice President of Operations for clixnmortar.

*Simon Group's Breach*

11. Beginning shortly after Haslund began working for Simon Group and continuing until Alshab herself left Simon Group in April 2000, Haslund asked Alshab on a number of occasions for shares representing her 1% equity interest in clixnmortar. In turn Alshab personally spoke with Simon on a number of occasions between January and April 2000 as to the need for Simon Group to carry out its promise to provide the equity interest in clixnmortar to Haslund. Because Simon would not honor Simon Group's promise to provide that equity interest to Haslund (as well as not honoring commitments to other key employees whom Alshab had hired), Alshab resigned from Simon Group in April 2000.

12. Immediately after Alshab left Simon Group, Haslund telephoned Simon to ask where the committed but unfulfilled promise to provide her with the agreed-upon 1% equity interest in clixnmortar stood. Simon personally reaffirmed that promise by responding:

Not to worry. I'll take care of you.

Despite that assurance, Simon reneged on the commitment: Haslund never received her assured 1% equity interest, she never received any stock representing that equity interest, and she never received any compensation in lieu of that equity interest.

13. During the first two weeks of September 2000, when Haslund learned of the existence of a transaction by which Found. com, Inc. ("Found") was to acquire an equity interest in clixnmortar, Haslund reiterated her demand for her own 1% equity interest. This time she directed her demand to Simon Group's Chief Administrative Officer John Rulli ("Rulli"). Rulli initially put Haslund off, and then on September 25, 2000 he abruptly terminated her.

*Consequences of Simon Group's Breach: Haslund's Equity Interest in clixnmortar*

14. Most serious among the issues separating the parties is the consequence of Simon Group's already-found breach of its obligation to provide Haslund with an equity interest in clixnmortar as part of the consideration for her employment agreement and for beginning her promised employment with Simon Group. Although Simon Group has acknowledged that breach, it takes the position that the obligation is unenforceable—in part because it is said to be ambiguous, in part because it is said to contravene Delaware law. Later Findings deal with the factual deficiencies in Simon Group's positions, while Conclusions 4–6 deal with the legal deficiencies in those positions.

15. Simon Group operated its related entities, and most specifically clixnmortar, in a free-wheeling manner and in disregard of corporate formalities. Thus (even apart from the inaccurate reference to clixnmortar as a "division" in the Letter Agreement) on some occasions clixnmortar was held out to be owned by "SPG Realty Consultants, LP" (P. Exs. 2 and 37), at other times clixnmortar was portrayed as a unit of "Simon Property Group" (P. Exs. 22 and 23) and on other occasions, during Simon Group's earnings reports for example, clixnmortar was described as a "Simon" subsidiary (P.Ex. 1; Simon Dep. 26–27).

16. Simon's own testimony did nothing to support the factual or legal arguments advanced by Simon Group (even apart from questions as to his credibility as such—see n. 3). For example, although Simon exercised ultimate authority over clixnmortar, he did not know whether he held any title or position with clixnmortar, he could not identify its officers or board members and he did not know if he was a member of the board of directors or if a board ever convened. Moreover, he also admitted that he didn't know if he ever held a position with Simon Property Group, L.P. or SPG Realty Consultants, Inc., or if clixnmortar was a subsidiary of SPG Realty Consultants, Inc., although he signed documents in his capacity as an officer for each of them.

17. Illustrative of the loose manner in which business was conducted among the various entities (sometimes referred to in these Findings as the "Simon organization" for convenience of reference) that existed under the umbrella of the publicly held Simon Group is the fact that during their respective tenures with Simon Group, Alshab and Haslund never heard of or used the names "SPG Realty Consultants, L.P.," or "Simon Property Group, L.P." Instead they and others carrying on clixnmortar's activities deliberately linked clixnmortar to Simon Group, the defendant here. Indeed, clixnmortar did not maintain a checking account, nor did it generate tax returns. Instead its finances were intermingled with those of other Simon organizations maintained at Simon Group's headquarters in Indianapolis.

18. Importantly, neither during Alshab's or Haslund's tenure with Simon Group, nor it appears at any time thereafter, did clixnmortar actually issue stock certificates. Instead, not only Haslund's ownership of an interest in clixnmortar but the interests of all others in ownership—both the Simon organizations and outside investors—were regularly identified and represented in terms of percentages, the amount and value of which were determined by Simon Group in connection with transactions entered into between the Simon organization and third parties.

19. Three outside investors—third parties other than Haslund and the Simon organization—acquired such ownership interests in clixnmortar, invariably described in terms of percentages, over time:

(a) On the eve of Haslund's offer of employment, Simon Group records confirm that Diamond Technology Partners ("Diamond") owned an "8.31% equity position in clixnmortar.com" (later diluted to 3.7%), and the Simon organization owned 91.7%.

(b) Found acquired "a 6.9% interest in the equity value of Clix" pursuant to the terms of a First Amendment to Software Development and Collaboration Agreement ("Collaboration Agreement") that was executed by Simon on September 1, 2000.

(c) CPG Partners, L.P. ("CPG") acquired a 9.3% ownership share in clixnmortar pursuant to the terms of a June 1, 2001 Subscription Agreement.

Clixnmortar's Ownership Structure statement and New Entity Summary Sheet confirm that the ownership percentages held by Diamond, Found, CPG and Simon in clixnmortar were based on each owner's respective share of the total value of clixnmortar.

20. Simon Group initially conceived clixnmortar as part of its internet strategy to serve as an incubator for products, ideas and businesses that would help retailers at the nationwide group of malls owned or operated by the Simon organization to integrate the online and offline shopping experience for their customers. To that end clixnmortar spearheaded the development of two products, FastFrog and YourSherpa. Both products were introduced to the Atlanta market in a pilot format starting in late 1999 and continuing through August 2000. Those pilot programs produced highly successful results: over double the estimated users for both products and, in the case of the YourSherpa product, a threefold increase in average sales per customer. That success also drove the development of a next generation product, "Clixlist," starting in August 2000 and continuing through at least mid–2001. At least one patent application was prepared and submitted in connection with clixnmortar's development of its in-store in-mall online shopping system. All interests and rights in that patent, excluding those claimed by Alshab, were assigned to Simon Property Group, L.P.

21. From the time that Simon Group launched clixnmortar in 1999 through at least mid–2001, clixnmortar was a successful start-up enterprise that, though it did not generate earnings, added value to Simon Group's portfolio. Throughout that time period numerous prospective investors expressed strong interests in acquiring some ownership participation in clixnmortar. Such prospective investors included real estate companies such as Westfield, Rouse and Chelsea Development/CPG Partners, technology companies including PocketCard, Symbol Technologies, Cisco, Diamond and Found, and venture capital organizations including Kleiner–Perkins, Softbank, Sequoia and Benchmark. Except for agreeing to Diamond's participation in clixnmortar, Simon declined to allow any outside investment in clixnmortar through August 2000, and during that same time frame he explicitly rejected inquiries by real estate companies and venture capital organizations that sought to invest in clixnmortar.

22. In August 2000 Simon's opposition to such outside investment changed. That change manifested itself in the investments by Found (see Finding 19(b)) and CPG (see Finding 19(c)) effective September 1, 2000 and June 1, 2001 respectively.

*Valuation of Haslund's Equity Interest*

23. Because clixnmortar stock (or equity in clixnmortar) was not the subject of an active market, other means of evaluation of Haslund's equity interest must be looked to. That means exists through an examination of the third party transactions in clixnmortar equity referred to in Finding

22—an examination addressed in Findings 24–33.

24. It is uncontested that CPG was a willing buyer that was under no compulsion to buy a stock interest in clixnmortar. According to Alshab, CPG's parent Chelsea Development ("Chelsea") announced in early 2000 that it wanted to invest in clixnmortar. Simon himself acknowledged that the CPG transaction, including the purchase price, was driven by Chelsea.

25. CPG's status as an informed and sophisticated purchaser of clixnmortar stock is confirmed by the terms of the parties' Subscription Agreement (P.Ex. 39). Its Paragraph 2(b) states that CPG "has received, read and understood [the] Subscription Agreement and has relied only on information provided to [it] by [clixnmortar]." Its Paragraph 2(c) confirms that CPG was given the opportunity to ask questions of, and receive answers from, clixnmortar concerning the terms and conditions of the offering and other matters pertaining to its investment, and was given any additional information it requested. Its Paragraph 2(d) confirms that CPG was purchasing clixnmortar shares solely for investment purposes. And its Paragraph 2(e) confirms that CPG had such knowledge and experience in financial, business and tax matters so as to enable it to evaluate the risks and merits of its investment in clixnmortar, and "to make an informed investment decision with respect to this investment."

26. It is equally uncontested that the Simon organization and clixnmortar were willing sellers under no compulsion to sell.

Beginning in August 2000 Simon directed the clixnmortar team to seek out investors actively, a goal that they ultimately accomplished by securing CPG's investment in clixnmortar.

27. It is also uncontested that CPG possessed reasonable knowledge of all relevant facts before it executed the Subscription Agreement and agreed to pay $5 million for a 9.3% stake in clixnmortar. Simon Group's secretary and general counsel James Barkley ("Barkley") forwarded clixnmortar's organizational documents together with current, unaudited financial information for clixnmortar (including a December 31, 2000 balance sheet) to CPG's parent company on May 29, 2001.

28. Subscription Agreement ¶ 1 obligated CPG to pay the $5 million purchase price through a June 1, 2001 wire transfer. Shortly after execution of the Subscription Agreement, entries were made in clixnmortar's records to reflect CPG's acquisition of a 9.3% minority ownership interest in exchange for that $5 million payment. And clixnmortar's books and records confirm that on June 30, 2001 Simon Group valued the total equity of clixnmortar as in excess of $53 million (a valuation directly confirmed by the agreed-upon price of $5 million for CPG's 9.3% interest).

29. With a total equity value of clixnmortar being at the level stated in Finding 28, based on capitalizing the agreed-upon $5 million figure—established by an arm's length transaction—to acquire a 9.3% minority interest, it is a reasonable inference that the then fair market value of the 1% minority equity interest to which Haslund was entitled was directly proportional: a value of $537,634.41 for that 1% interest.[4]

---

4. Simon Group correctly points to a contemporaneously-arrived-at agreement under which one of its related entities agreed to purchase an interest in a CPG subsidiary for a like $5 million price (P.Ex. 38). But Simon Group impermissibly (and unpersuasively) seeks to leapfrog from that fact to the contention that the agreed-upon $5 million purchase price for CPG's acquired interest in clixnmortar was somehow meaningless. Not so—what controls instead is the fact that the highly knowledgeable buyer and seller, free to negotiate an arms-length transaction, chose to establish $5 million as the then value of an agreed-upon 9.3% equity interest in clixnmortar. That was, it will be remembered, at a

Indeed that value appears conservative, because by agreement Haslund's 1% equity entitlement was not subject to restrictions of any kind, while CPG's 9.3% interest was subject to a number of restrictions such as those limiting the transfer of shares (P.Ex. 39).

30. By its failure and refusal to honor its obligation to provide Haslund with the 1% equity interest to which she was entitled, Simon Group also deprived her of the opportunity to realize on the value of that equity interest. By June 2001 Haslund had already been terminated, and there would have been no incentive for her to remain with the ownership of a small minority interest in a venture with which she was no longer associated and over which she had no control. But the CPG transaction (as well as Simon's own then-existing desire to interest outside investors) provides the best evidence that outside investor interest was high at that time, in view of what then appeared to be a promising potential for the development of the clixnmortar products. Because Simon Group's breach of contract frustrated Haslund's (and hence this Court's) opportunity to ascertain the actual course of events that would have ensued at that time, this Court is perforce driven to the drawing of inferences. And it is a reasonable inference that CPG, with its demonstrated desire to invest in clixnmortar, would have been willing to enlarge that investment to a 10.3% equity interest by contemporaneously purchasing Haslund's interest for a corresponding price—the value referred to in Finding 29. For the reason stated in this Finding and in Conclusion 7, Simon Group will not be heard to challenge that reasonable inference as speculative: Its own conduct in breaching its contractual obligation has thwarted any opportunity to learn what would actually have taken place.

31. It is true, as Simon Group urges, that further developments (principally, though not entirely, the difficulty of developing workable software to implement the clixnmortar concept) caused Simon to lose his enthusiasm for the project not long after June 2001, leading Simon Group (a) to a third quarter 2001 announcement that it would commit no additional resources to the clixnmortar venture and (b) to its writeoff of funds invested in clixnmortar up to that point (with the writeoff of course providing Simon Group with a tax benefit).[5] As the trial of this case approached, Simon Group dissolved clixnmortar in February 2003 (D.Ex. 12).[6]

■ 32. Although the circumstances under which Found acquired an interest in clixnmortar were very different from those of the CPG transaction—Found entered

---

time when clixnmortar was valued as a highly promising venture (by Simon and Simon Group as well as by CPG). Simon Group will not be heard to denigrate its own contemporaneous evaluation based on later developments and hindsight.

5. Even so, Simon Group's 2001 Annual Report (J. Ex. 7) stated as to clixnmortar that "there is value to the product that may have viability once the economy rebounds and technology becomes more integrated with the shopping experience." And a Simon Group subsidiary retains the patent referred to in Finding 20.

6. Haslund's Proposed Finding 85 says in relevant part:

> Undoubtedly, SPG, Inc.'s belated decision to dissolve clixnmortar was driven by liability avoidance, and accompanied by a decision to transfer clixnmortar's technology, systems and intellectual property elsewhere within the bowels of the Simon empire thereby rendering clixnmortar permanently without value, and gutting Haslund's 1% equity forever.

Simon Group denies any such motivation. This Court need not resolve that dispute, for damages rather than specific performance is the appropriate remedy for Simon Group's breach.

into a September 1, 2000 Collaboration Agreement that contemplated the future conversion of its account receivable of $3.7 million in unpaid consulting fees into "a 6.9% interest in the equity value of Clix" (P.Ex. 41)—the value placed on that interest by clixnmortar and another Simon organization (both represented by Simon himself) on the one hand and third party Found on the other hand strongly corroborates the fair market value for clixnmortar established by the sale to CPG several months later. Simon Group seeks to avoid that fact by stating that it "dictated the terms of the Agreement, which Found had to sign to avoid termination of its relationship with [Simon Group]" (Simon Group's response to Haslund's Proposed Finding 69). But once again that misses (presumably deliberately) the significance of that transaction for this case. Both parties to the Collaboration Agreement were highly knowledgeable about clixnmortar: Found served as a consultant to clixnmortar and as a partner in the development of clixnmortar's products, while Simon Group's knowledge goes without saying. When Simon Group "dictated the terms of the Agreement," *it* placed a $3.7 million value on a 6.9% interest in clixnmortar. That too translates to an over $53 million total value for clixnmortar, a figure virtually identical to that established by the CPG transaction nine months later (see Finding 28). And that in turn would translate to a value of $536,231.88 for Haslund's 1% equity interest—a near dead heat with the $537,634.41 valuation based on the CPG deal (see Finding 29).[7]

33. Further corroboration of that value for clixnmortar as established by the Found transaction is provided by an internal business meeting to discuss the Collaboration Agreement on November 27, 2000, attended by Barkley (a corporate officer of clixnmortar and Simon Group), Robert Covington (a Simon Group technology officer and vice president of clixnmortar) and clixnmortar's controller Janet Alberti ("Alberti"). Simon Group acknowledges the authenticity of P.Ex. 42, which includes a large number of Alberti's handwritten notes—and importantly, at the place where the typewritten agenda refers to the transaction by which Found's $3.7 million in unpaid fees was to be converted to a 6.9% equity in clixnmortar if clixnmortar did not sell equity securities by June 30, 2001 (which would enable it to pay the fees), there was a handwritten note referring to "implied $52 mill value in Clix."

34. Interest at the Illinois statutory prejudgment rate of 5% per annum on the $537,634.41 value of her 1% equity interest in clixnmortar, calculated from the time that she reasonably could expect to have realized on that interest (June 1, 2001— see Finding 30) through the anticipated docketing date of the judgment to be entered pursuant to these Findings and Conclusions, amounts to $62,724.01.

*Other Contract Damages*

35. Simon Group also breached its employment contract with Haslund when it failed and refused to pay her for the unused portion of her 15 vacation days and when it failed and refused to reimburse her for business related expenses, housing costs and the costs she incurred in relocating back to the west coast after it terminated her. Findings 36–38 address the

---

**7.** As stated in this Finding, the Found transaction was entered into on September 1, 2000—less than a month before Haslund's termination. Though as stated here the different circumstances do not permit the Found transaction to be viewed as probative of a market for the Haslund interest (as is true, by contrast, with respect to the CPG transaction), it confirms that Simon Group viewed clixnmortar's value as highly stable at least during the entire period beginning just before, and extending for at least nine months after, Haslund was terminated.

damages sustained by Haslund as the result of those breaches.

■ 36. As to vacation pay, the agreement arrived at between Haslund and Simon Group (acting through Alshab), as described in Finding 9, is entirely permissible under Illinois law—see, e.g., *Prettyman v. Commonwealth Edison Co.,* 273 Ill.App.3d 1090, 1095–96, 210 Ill.Dec. 478, 653 N.E.2d 65, 69–70 (1995). Haslund used only two of the 15 vacation days to which she was entitled during 2000 under that agreement. Based on Haslund's base salary of $175,000 per year, the monetary equivalent of Haslund's 13 unused vacation days is $8,749.99. Simon Group was therefore obligated to pay Haslund that amount at the time of her September 25, 2000 separation from Simon Group. But because a good faith dispute between the parties existed on that score (Simon Group has contended that vacation days should have accrued ratably during the year, rather than at the very beginning of the year, as Alshab and Haslund agreed—see Finding 9), no prejudgment interest is payable on that amount (see Conclusion 9).

■ 37. Haslund admittedly documented $3,717.08 in unreimbursed business expenses through her termination date. Simon Group's failure to reimburse Haslund for those expenses damaged her in that amount, together with an additional $526.58 in prejudgment interest through July 25, 2003. Because Simon Group tendered a check to Haslund's attorney in full payment of that amount (including interest) on July 14, 2003, it will not be included in the contemporaneously entered judgment order.[8]

■ 38. In early 2000 Alshab admittedly promised to reimburse Haslund to relocate back to the west coast if her position at Simon Group terminated for any reason. Simon himself reaffirmed that promise in the summer of 2000, and when Rulli terminated Haslund on September 25, 2003 he too reiterated that promise to Haslund, along with his promise to pay for Haslund's housing costs through December 2000. As with the claim referred to in Finding 37, Simon Group's July 14, 2003 check delivered to Haslund's attorney included the full amount of those items (including interest), so the contemporaneously entered judgment order will not include them either.

*Conclusions of Law*

1. This Court has subject matter jurisdiction under Section 1332 because the parties are of diverse citizenship and the amount in controversy, exclusive of interest and costs, is far in excess of $75,000. Venue in this judicial district is proper under Section 1391(a)(2) because "a substantial part of the events or omissions giving rise to the claim occurred" in this district (it may also be noted that when Simon Group timely removed this action from its state court of origin to this District Court and thereafter filed its Answer (including affirmative defenses) and proceeded to carry on this litigation through trial, it never raised any question as to venue).

2. *Erie v. Tompkins* principles require this Court to look to Illinois choice of law rules (*Klaxon Co. v. Stentor Elec. Mfg. Co.,* 313 U.S. 487, 61 S.Ct. 1020, 85 L.Ed. 1477 (1941) and its virtually innumerable proge-

---

8. Haslund's response to footnote 2 in Simon Group's Proposed Findings of Fact and Conclusions of Law raises a question on that score, based on Simon Group's long delay in making the July 14, 2003 payment. But Haslund has not identified any damages other than statutory prejudgment interest that she seeks in that respect. Findings 37 and 38 and the contemporaneously entered judgment order have therefore omitted any reference to the now (albeit belatedly) paid items.

ny). No choice of law provision was included in the parties' Letter Agreement, so that the general Illinois choice of law doctrine applies. On that score, both because Illinois is the center of gravity of the matter at issue and because the parties' submissions have focused on Illinois authorities (including federal decisions applying Illinois law), this Court will do the same.

■ 3. Simon Group attempts to escape its obligation to perform the critically disputed term of Haslund's employment—Simon Group's unequivocal promise to provide Haslund with a 1% interest in clixnmortar—by urging such matters as the claimed indefiniteness and ambiguity of that promise and the Letter Agreement's omission of a stated deadline for Simon Group's performance. Analysis, however, plainly demonstrates why all of Simon Group's claims of unenforceability of its commitment are fatally flawed. Conclusions 4–6 address that subject.

4. Most frequently parties who dispute as to the meaning of a written contract between them cross swords over such issues as whether the contract's terms are unambiguous (as one side typically urges) or ambiguous (as the other side typically contends), with the latter stance being urged to permit evidence other than the written words in the contract's "four corners" to be considered in construing the contract (see, for thoughtful expositions of that most-often-encountered scenario, such cases as *FDIC v. W.R. Grace & Co.*, 877 F.2d 614, 620–22 (7th Cir.1989) and *AM Int'l, Inc. v. Graphic Mgmt. Assocs., Inc.*, 44 F.3d 572, 574–77 (7th Cir.1995)). And of course that is so because the adversaries in such lawsuits are contending for different contractual meanings. But this case presents a not-often-encountered situation: one in which the two persons who negotiated a term that was then reduced to writing in the Letter Agreement (Haslund acting

on her own behalf and Alshab acting as the expressly authorized agent for Simon Group in the transaction) have testified unequivocally, unambiguously and wholly credibly to their *mutual* agreement regarding the critical contractual component of the 1% equity interest in clixnmortar to which Haslund became entitled as soon as she committed to, and then entered upon, the employment that Simon Group wished her to undertake. And that situation brings into play a principle wholly different from the conventional objective theory of contract law.

■ 5. Because the situation in this case, as described in Conclusion 4, is unusual in a contract action (in this instance Simon Group is seeking to squirm out of the agreement made for it by its wholly authorized agent, an agreement that has been squarely acknowledged by the agent—and indeed was essentially confirmed by Simon himself), it is worth quoting from rather than merely citing to decisions that address such circumstances. Here for example is *TKO Equip. Co. v. C & G Coal Co.*, 863 F.2d 541, 545 (7th Cir.1988) (citation omitted) (an Indiana-based case, but expressing universal principles of contract law):

> Under the prevailing will theory of contract, parties, like Humpty Dumpty, may use words as they please. If they wish the symbols "one Caterpillar D9G tractor" to mean "500 railroad cars full of watermelons," that's fine—provided parties share this weird meaning. A meaning held by one party only may not be invoked to change the ordinary denotation of a word, however. Intent must be mutual to be effective; unilateral intent does not count.

To the identical effect (though more brief) as to Illinois law, here is *J.F. McKinney & Assocs., Ltd. v. Gen'l Elec. Inv. Corp.*, 183

F.3d 619, 622 (7th Cir.1999) (emphasis in original and citations omitted):

> Illinois uses an objective theory of contract under which understandings and beliefs are effective only if *shared*.[9]

And again applying Illinois law, even where an alteration of the meaning of a clear contract is involved (a more difficult situation that is not presented here), here is *AM Int'l*, 44 F.3d at 575–76:

> There are exceptions to the rule that only objective evidence can be used to alter the meaning of a clear contract, but they are consistent with the underlying principle. If the parties agree to an idiosyncratic meaning, the court will honor their agreement.

This Court too has had occasion to address the issue of enforceability of a mutually-agreed-upon vocabulary or meaning, even in the absence of what some third party might perceive as an ambiguity. Here is *Dreiling v. Maciuszek*, 780 F.Supp. 535, 542 (N.D.Ill.1991) (emphasis in original, and footnote omitted):

> Insurance contracts are after all *contracts*, with the drafters of the documents able (like patentees in their own patent applications) to serve as their own lexicographers. If for example a contracting party wanted to use the word "apple" in a contract to include "tomato," and if the party effectively reflected that intention in an appropriate way, that party would be entirely free to do so. And the fact that someone else who was unaware of that special usage, but who simply heard the word "apple," would not understand that "tomato" was also meant to be included (understand-

ably, because it is not normally spoken of as an apple) would not make the slightest difference to the validity of that meaning in contractual terms.

In sum, the mutual understandings as to Haslund's entitlement to the 1% equity interest in clixnmortar, to which Haslund and Alshab testified and that this Court has confirmed in the Findings, are binding on Simon Group and fully enforceable against it.

6. Simon Group attempts to add another string to its bow, arguing for the unenforceability of its express promise to convey a 1% equity in clixnmortar to Haslund in exchange for her undertaking employment as she promised to do (and did in fact)—this time pointing to provisions of the Delaware Constitution, the corporate provisions of the Delaware Code and Delaware caselaw that preclude the issuance of stock in exchange for an agreement to render future services, as contrasted with "labor done." But that string is just as broken as the one that has been addressed and found totally deficient in Conclusions 4 and 5. At all times Simon Group or its subsidiaries had as part of its or their asserts a very high percentage of the total equity interest in clixnmortar (ranging from a high of just under 92% to later levels that were always at least 80%). Simon Group's compliance with its promise to provide Haslund with 1% of the total equity interest could simply have taken the form of its assignment of that 1% out of Simon Group's own existing interest, which would not at all implicate the asserted problem with which Simon Group has sought to muddy the waters. And if any

---

9. [Footnote by this Court] Ironically, Simon Group's Proposed Conclusion of Law 17 quotes that very language in an unsuccessful effort to urge that a different conclusion be reached—but it fails to emphasize (as did the *McKinney* opinion itself) the word "shared." That appears to be a Freudian omission, for

Simon Group blinds itself to the fact that the understandings and beliefs of both Alshab (who for that purpose *was* Simon Group) and Haslund, as reflected in the Findings, were indeed shared and were hence "effective"—mutually binding.

concern existed over whether the assignment to Haslund should take the form of actual shares of stock rather than an undivided equity interest, it was totally within the control of Simon Group to cause clixnmortar shares to be issued and thus to make the requisite number of shares the subject of its assignment to Haslund. In that respect the promise and its enforceability are no different from a situation in which an employer has assets of any kind and promises a new employee to deliver any such assets (whether a car, or shares of stock in some other company, listed or unlisted, or anything else) in consideration of the employee's entering upon employment, as well as to pay money for the employee's services as rendered. So this added contention by Simon Group is, to mix metaphors, another red herring—it has no substantive merit.

 7. Both parties point extensively, on the issue of damages attributable to Simon Group's breach of its equity-interest obligation to Haslund that has been totally confirmed by these Findings and Conclusions, to *Telemark Dev. Group, Inc. v. Mengelt*, 313 F.3d 972 (7th Cir.2002) (*"Telemark II"*), affirming this Court's opinion reported at 181 F.Supp.2d 897 (N.D.Ill.2002) (*"Telemark I"*), each of which decisions relied on and cited to Illinois caselaw. But once again Simon Group's attempted reliance on *Telemark II* is grounded on false premises (or more precisely, is entirely ungrounded), while Haslund's position is fully supported by both cases. As *Telemark II*, 313 F.3d at 983 (citations and footnotes omitted) teaches in dealing with the measure of damages for conversion of stock (which is directly equivalent, for purposes of this case, to damages for the breach of Simon Group's promise to deliver the 1% equity interest in clixnmortar): [10]

> Under Illinois law, the ordinary measure of damages for conversion of personal property is the fair market value of the property at the time of conversion. The same rule generally adheres when the property converted is stock.

> However, where the stock appreciates in value after the date of conversion, several courts have held that the plaintiff may recover the highest value of the stock within a reasonable time after the conversion. Illinois courts have indicated their agreement with such an approach on a few occasions, at least in the context of breach of contract.

> Telemark is entitled to recover damages based on the market value of the stock at the time of conversion or within a reasonable time thereafter.

And lest there be any concern that those cases do not accurately reflect Illinois law, here is how *Alimissis v. Nanos*, 171 Ill. App.3d 1005, 1010–11, 121 Ill.Dec. 826, 525 N.E.2d 1133, 1136–37 (1988) (numerous citations omitted) has stated the identical concepts:

> The proper measure for damages in a breach of contract case, such as the one before this court, is the amount which will place the plaintiff in the position he would have occupied had the contract been performed. It is well established that the proper measure of damages for corporate stock is its market value at a time reasonably close to the date of breach. In a factually similar case,

---

**10.** As the prelude to its next-quoted pronouncement in *Telemark II*, the Court of Appeals upheld this Court's factual determination as to when the plaintiff there would have been able to sell the stock if it had been delivered rather than converted—the precise equivalent of the June 1, 2001 date as to which Finding 30 determined that Haslund, who should earlier have been put into possession of the equity interest, could in turn have sold it.

*American National Bank & Trust Co. v. Erickson* (1983), 115 Ill.App.3d 1026, 72 Ill.Dec. 71, 452 N.E.2d 3, the written agreement specifically provided that the plaintiff receive in return for the loan of Teledyne Corporation stocks "shares of stock and cash so as to replace Getz [plaintiff] in the same position * * * as he would be had he not loaned the shares." (*Erickson,* 115 Ill.App.3d 1026, 1030, 72 Ill.Dec. 71, 74, 452 N.E.2d 3, 6.) In *Erickson,* this court affirmed a judgment for the plaintiff where the trial court had measured the damages for failure to return stocks as of the date of judgment so that the plaintiff would not be deprived of the benefit of the increased value of the shares. Other courts have based damages on the highest market value for that stock since the date of conversion. Thus, courts have used different data for determining the value of stock in an effort to ensure that the defendant does not receive a benefit from his breach of contract. Accordingly, we do not believe the trial court here improperly determined the damages based on the highest market value of that stock where it was at a time near to, but not precisely at, the time of the breach.

In this instance the equivalent of the "time of conversion" for purposes of the rule stated in all of those cases would have been the December 27, 1999 date when Haslund began her employment with clixnmortar at Simon Group's direction. And under the circumstances of this case, with Simon Group having welshed on its promise to deliver the equity interest, "a reasonable time thereafter" would include the June 1, 2001 date (after Rulli had severed Haslund from employment, still without Simon Group's having complied with its obligation), when it is reasonable to conclude that Simon could have sold that interest to CPG (see Finding 30). As Finding 29 has established, the market value of

the 1% equity interest "within a reasonable time thereafter" in relation to the date of breach was $537,634.41.

8. Simon Group's further efforts to extricate itself from the impact of Conclusion 7, based on the asserted absence of a market for the equity interest in clixnmortar and like contentions, fail for the fundamental reason articulated by the Supreme Court nearly six decades ago in *Bigelow v. RKO Radio Pictures, Inc.,* 327 U.S. 251, 264–65, 66 S.Ct. 574, 90 L.Ed. 652 (1946), which this Court cited in *Telemark I,* 181 F.Supp.2d at 902 as standing for this proposition—something that could equally as well have been written for this case:

> [T]he situation presents a classic occasion for application of the general rule that uncertainties about the amount of damages stemming from the wrongdoer's misconduct must be resolved against that wrongdoer....

And that *Bigelow*-based principle is still alive and well and living in the Seventh Circuit—here is how *BE&K Constr. Co. v. Will & Grundy Counties Bldg. Trades Council, AFL–CIO,* 156 F.3d 756, 770 (7th Cir.1998) (citations omitted) has articulated the same concept:

> While damages cannot be based on pure speculation or guesswork, they also need not be proven with the certainty of calculus. And where, as here, the uncertainty as to the damages stems from the defendants' illegal conduct, the defendants should not benefit from the uncertainty they created: "Speculation has its place in estimating damages, and doubts should be resolved against the wrongdoer."

Because Simon Group's misconduct in failing to adhere to its express promise deprived Haslund of the opportunity to realize on the promised equity interest in clixnmortar, the principles stated in such cases justify—indeed, affirmatively call

for—the Findings dealing with the quantification of Haslund's damages in that respect.

9. Among other bases for requiring the payment of prejudgment interest at the rate of 5% per annum, 815 ILCS 205/2 includes "money withheld by an unreasonable and vexatious delay of payment." Simon Group attempts to avoid the impact of that provision by characterizing its nonperformance as to the promised equity interest in clixnmortar as stemming from an "honest dispute as to the existence of a legal obligation" (see its Response to Haslund's Proposed Findings and Conclusions 96, seeking to invoke to that end *Telemark II*, 313 F.3d at 986). Again acceptance of that proposition would reward Simon Group for its own misfeasance, for its unjustified breach was the direct cause of Haslund's inability to realize on the value of the 1% equity in clixnmortar and thus to obtain a precise quantification of her damages in that respect. Accordingly the damages attributable to that breach indeed involved "an unreasonable and vexatious delay of payment," justifying the award of prejudgment interest set out in Finding 34. By contrast, as stated in Finding 36, no prejudgment interest award attaches to the unpaid vacation days obligation, because on that subject there was indeed an "honest dispute as to the existence of a legal obligation."

■ 10. Finally, despite the contention of Simon Group to the contrary, the fact that the amount it is obligated to pay because of its "1% equity" breach is unliquidated does not eliminate the accrual of prejudgment interest on the ascertained value of that interest. As *New Hampshire Ins. Co. v. Hanover Ins. Co.*, 296 Ill.App.3d 701, 709, 231 Ill.Dec. 293, 696 N.E.2d 22, 28 (1998) teaches:

> [I]f the amount is determinable, interest can be awarded on money payable even when the claimed right and the amount due require legal ascertainment.

That is precisely the situation here, and it further supports the interest award calculated in Finding 34.

\* \* \* \* \* \*

In accordance with the foregoing Findings and Conclusions, it is hereby ordered that judgment be entered pursuant to Rule 58 in favor of plaintiff Shannon Haslund and against defendant Simon Property Group, Inc. in the sum of $609,108.41. As provided in Rule 54(d)(1), plaintiff shall also recover of defendant her costs of this action.